UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

MICHELLE MORTON,

        Defendant.

No. 16-cr-00371 (RA)

**MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENT'S MOTIONS TO PRECLUDE CERTAIN CROSS-EXAMINATIONS AND DEFENSE EXHIBITS**

ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019
(212) 506-5000

*Attorneys for Defendant Michelle Morton*

Defendant Michelle Morton respectfully submits this memorandum of law in opposition to the government's motions *in limine* to preclude certain cross-examinations and defense exhibits.

## ARGUMENT

I. **The Court Should Deny The Government's Motion to Preclude Cross-Examination of Witness-1 Regarding Drug-Related Conduct**

Two days ago, the government first moved to preclude defendants from cross-examining Witness-1—a credit analyst and junior portfolio manager at Hughes Capital Management—about his personal illegal drug use, illegal drug sales, and arrests for battery and possession of illicit substances. *See* Govt. Mot. at 1-2. The government conveniently makes its motion one week before trial despite the fact that it has known since mid-March that Witness-1 comes with large amount of baggage. Nonetheless, for the reasons stated below, the relevance of Witness-1's drug habit and related conduct extends beyond his perception of the Bond purchase and touches his reasons for resigning from Hughes, his treatment of women in positions of power, his reasons for assisting the government, and his veracity. The relevance and probative value of Witness-1's drug abuse and related conduct thus outweigh any prejudice or "embarrassment" to him or to the government.

A. **Applicable Law**

Federal Rule of Evidence 806(b)(1) plainly allows cross-examination of a witness's prior acts if the acts "are probative of the character for truthfulness or untruthfulness of . . . the witness [or] another witness whose character the witness being cross-examined has testified about." Fed. R. Evid. 806(b)(1)-(2).

It is undoubtedly within the "proper scope of cross-examination to determine whether a witness was under the influence of drugs or narcotics or alcohol at the time of observation of

1

events in dispute, or at the time the witness is testifying." *United States v. DiPaola,* 804 F.2d 225, 229 (2d Cir. 1986). Under normal circumstances, the bearing of substance abuse on moral character "does not involve the veracity trait . . ., it will *usually* not be admissible." *Id.* at 230 (emphasis added) (citations and quotations omitted). However, testimony about long-term drug use and related conduct may be admitted where the "continued addiction" bears on the witness's "mental faculties, irrespective of whether he was under the immediate influence of the drug at the time of the occurrence." *Chicago & N.W. Ry. Co. v. McKenna*, 74 F.2d 155, 158–59 (8th Cir. 1934) (reversing the exclusion of drug-related testimony because it bore directly on witness's veracity, including his honesty and his aggressiveness). In such cases, the cross-examination may elicit that the "habitual use of morphine, cocaine, and other like narcotics, which inevitably tend to impair the mind, destroy the memory and moral character of a witness may be shown for the purpose of affecting his credibility or the weight that should be given to his testimony." *Id*. As described below, Witness-1 presents precisely such circumstances.

### B.  Witness-1's Lengthy Drug Abuse and Related Conduct are Admissible and Highly Probative of His Veracity

The government concedes that the defendants "may cross-examine Witness-1 concerning whether the influence of drugs impaired his perception of events related to Morton's and Hirst's purchase of the WLCC Bonds in August 2014." Govt. Br. at 5. But the government's concession of a sliver of permissible cross-examination material regarding Witness-1's drug abuse and related conduct is woefully inadequate. While it may be true that evidence of long-term illegal drug consumption *in and of itself* does not bear on Witness-1's veracity, the circumstances surrounding Witness-1's admitted drug abuse, its effects on his memory, his efforts to hide it from authorities, and his treatment of women are each relevant and bear directly on his credibility and truthfulness.

2

According to the 3500 material, the government first learned about Witness-1's apparent heavy drug abuse problem during an attorney proffer from Witness-1's counsel. The attorney proffer took place two days before the government interviewed Witness-1. The government learned during the attorney proffer that Witness-1's heavy drug abuse—including use of mind-altering substances like LSD, methamphetamine, and cocaine—occurred during his employment at Hughes. The government also learned about multiple citations or arrests (or possibly both) for drug possession during which Witness-1 attempted to hide drugs from authorities, and one charge for battery against his girlfriend in connection with one of the drug-related arrests.

Witness-1's counsel appears to have suggested to the government that Witness-1 will assert his Fifth Amendment right in response to any questions concerning his drug use and related conduct. The government has held only one meeting to date with Witness-1 following his attorneys' proffer. At that meeting, and with the knowledge that Witness-1 may assert his Fifth Amendment rights with respect to drug-related questions, the government did not ask Witness-1 any questions at all about his drug use, his efforts to hide it, and its impact on his memory or his treatment of women. And now the government seeks to preclude anyone from exploring these issues.

1. *Witness-1's Memory and Mental Clarity*

The government's single meeting with Witness-1 is telling with respect to his memory and mental clarity. Witness-1 spews with apparent conviction vitriolic and generalized statements about Hughes, the Bonds, Ms. Morton and Mr. Hirst. However, when confronted with documents, he has little to no memory of receiving emails, reviewing documents, or having obvious communications about the Bonds with a variety of individuals at Hughes. This disconnect may reasonably be related to Witness-1's use of hallucinogens and mind-altering

3

drugs including LSD, methamphetamine, and cocaine.[1]  The nature of these illegal substances is undeniably impactful with respect to Witness-1's ability to perform his job as a credit analyst and junior portfolio manager at Hughes, his ability to accurately assess the Bond purchase, his memory of those events (because of drugs abuse at the time and since), and his ability to testify with any mental clarity today.  Indeed, while the proffer notes indicate that Witness-1 weened himself off of methamphetamine and cocaine, he was in possession of—and presumably using—LSD as recently as approximately February 2018.

Witness-1's drug abuse and attendant behavior is factually relevant to the instant case.  In light of Witness-1's use of these drugs during his employment at Hughes and the long-term effects of these drugs on memory and aggression, the nature and the length of Witness-1's drug use bears directly on his perception of the Bond purchase and his ability to testify truthfully and accurately at present.  Accordingly, Witness-1's mind-altering drug abuse bears far more on his veracity than the garden-variety alcohol and marijuana use that has no direct relationship to the alleged offense conduct in the cases on which the government relies.  *See*, *e.g.*, *DiPaolo*, 804

---

[1]  According to a government-sponsored website detailing various illegal drugs, LSD is a common hallucinogen that can, among other effects, "disrupt a person's ability to think and communicate rationally, or even to recognize reality" and can cause "emotions to swing wildly and real-world sensations to appear unreal . . .." Report on Hallucinogens and Dissociative Drugs, Research Report Series, National Institute on Drug Abuse, *available at* https://www.drugabuse.gov/publications/research-reports/hallucinogens-dissociative-drugs/director.  Similarly, repeated cocaine use can "alter brain structure and function if used repeatedly." Report on Cocaine, Research Report Series, National Institute on Drug Abuse, *available at* https://www.drugabuse.gov/publications/research-reports/cocaine/what-cocaine.  Finally, methamphetamines, or "meth," can cause "*memory loss*, aggression, psychotic behavior" and these symptoms "can sometimes last for months or years after a person has quit abusing methamphetamine . . .." Report on Methamphetamine, Research Report Series, National Institute on Drug Abuse, *available at* https://www.drugabuse.gov/publications/research-reports/methamphetamine/letter-director.

F.2d 225 (2d Cir. 1986) (precluding cross-examination about witness's drinking problem in a robbery and witness-intimidation case).

### 2. *Witness-1's Attempt to Hide Illegal Drugs from Law Enforcement*

Witness-1's drug-related conduct bears directly on his trustworthiness as a witness. Witness-1's attorney proffer indicates that Witness-1 was stopped for speeding in New York State only three months ago. At the time, Witness-1 was in possession of marijuana and multiple tabs of LSD. He received a citation for speeding and for marijuana possession, but he apparently managed to discard the LSD on the road in an attempt to avoid detection.

Witness-1's most recent drug-related incident illustrates two points that Ms. Morton should be permitted to explore through cross-examination. First, the incident suggests that Witness-1 may still be using strong mind-altering substances such as LSD, which could impact his ability to testify truthfully and recall events accurately. Second, his efforts to avoid detection by the authorities goes directly to his veracity.

Discarding LSD to avoid detection is a clear form of deception. Ms. Morton has reason to believe that Witness-1 is not being forthcoming about the Bonds purchase at Hughes. The two acts of dishonesty have one common denominator and Ms. Morton should be permitted to explore Witness-1's propensity not only to lie, but to lie to law enforcement.

### 3. *Witness-1's Incentive to Assist the Government*

Ms. Morton should be permitted to inquire as to Witness-1's incentive to testify in accordance with the government's theory. In Witness-1's March 14 proffer, the government asked nary a question about drug abuse; it did not inquire whether Witness-1 used drugs while at Hughes; whether he used drugs during the work day, whether his drug abuse impacted his mood, temperament or ability to recall events accurately or any other question relating to drug abuse. Nor did Witness-1 have to plead guilty for his repeated narcotics possession, sales, and use, as

admitted through his agent. Thus far, it appears that Witness-1 has gotten a pass on his recently-disclosed drug crimes. For this reason, Ms. Morton has the right to confront him about his motive for supporting the government's faulty narrative in this case. Witness-1's attorney apparently informed the government that Witness-1 would assert his Fifth Amendment right in response to any drug-related questions; this informs the Court and the defendants that the government has a reason to avoid inquiring about issues that are related to Witness-1's drug abuse and that Witness-1 has an incentive to testify favorably for the government to encourage the government to continue to turn a blind eye to his repeated crimes.

Witness-1 is not an occasional user of recreational drugs. Witness-1 is a self-admitted abuser and seller of Schedule One narcotics. Furthermore, Witness-1 has two prior drug citations, an arrest for battery (which again points to drug-related aggression and mental instability), two unprosecuted incidents of not only possessing but *selling* methamphetamine and cocaine to a friend and a family member, and an unprosecuted (due to evasion) incident of LSD possession. For these reasons, Witness-1 has an enormous incentive to play nicely in the government's sandbox so that it does not act on that information. Witness-1's incentive goes directly to his suspect credibility. Ms. Morton should be free to cross-examine him on this basis.

### 4. *Witness-1's Illegal Acts and Treatment of Women*

Witness-1 was arrested for battery, apparently involving his then-girlfriend. While the charges were dismissed, Witness-1's behavior is probative with respect to his drug-related aggression and his treatment toward women. Witness-1 was, at least earlier in time, estranged from the mother of his daughter. Witness-1's 3500 material indicates that, having worked for Ms. Morton for less than a month, he considered and called her his enemy. Ms. Morton has learned from other witness whom she may or may not call at trial that Witness-1 has negative feelings toward women in general. Therefore, Ms. Morton is entitled to explore whether

6

Witness-1's testimony against her is driven by a memory unclouded by narcotics abuse or by some other insidious view of women, particularly women with any form of authority or power in relation to Witness-1.

*   *   *

Each of the above reasons provides an independent basis for permitting Ms. Morton to cross-examine Witness-1 about his significant past—and potentially current—abuse of mind-altering illegal drugs, and his propensity for aggression, deception, and anger toward women. These areas of testimony bear directly on Witness-1's veracity and credibility. The Court thus should deny the government's motion to preclude Ms. Morton from these relevant and probative matters for cross-examination.

## II. The Court Should Admit Ms. Morton's Statements Regarding Cooperation and Other Evidence That Presents a Factually Complete Picture of the Alleged Conduct

The government seeks to preclude certain specific defense exhibits, categories of defense exhibits, and purported self-serving statements on the basis that each of these is hearsay or irrelevant evidence. For the following reasons, the Court should deny the government's motion as it applies to Ms. Morton.

### A. Applicable Law

As the government intones, evidence is only admissible if it is relevant, "that is, having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable." Fed. R. Evid. 401. But the thrust of the government's motion is that all of its evidence—whether relevant or probative or hearsay—will come in as party opponent statements or statements in furtherance of the conspiracy, and yet the defendants should be denied their opportunity to present any defense based on the government's narrow and

7

self-serving view of relevance and admissibility.  This is the government's continuing and thinly veiled attempt to prevent the jury from hearing any counter-narrative to its theory of this case.

Federal Rule of Evidence 106 provides a remedy for the government's unbalanced approach.  The rule of completeness requires admission of hearsay when that statement is "necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." *United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007) (citation omitted).  Based on the government's intention to rewrite history by offering only part of the facts at issue, Rule 106 will come into play frequently, though counsel has no means by which to predict its use or frequency until the government presents its evidence.[2]  Moreover, Ms. Morton will rely chiefly on the hearsay exceptions for state of mind under Rule 803(3) and a general non-hearsay offering of documents to simply demonstrate that a communication occurred.  Ms. Morton responds to each of the government's objections by exhibit and category below.

      **B.**      **Emails in which Ms. Morton is Neither a Sender Nor Recipient**

           **1.**      *DX1001*

Ms. Morton anticipates offering this January 26, 2012 email from Cliff Moore (a government witness) to Frankie Hughes (the former owner of Hughes Capital Management) as a business record under Rule 803(b)(6).  Ms. Morton intends to establish that, as a course of business, Moore instructed Hughes Capital Management to raise cash in its portfolio for a variety

---

[2]  For example, there are ample emails between the August 12, 2014 and August 20, 2014 demonstrating that Hughes compliance and investment employees received due diligence materials on and performed a portfolio acceptance analysis of the Bonds.  The government has marked only one early email in which it appears that the Chief Compliance Officer concludes that no accounts can take the bonds, but appears to ignore the remainder of the analysis during which that view changes.  Should the government seek to admit only one aspect of the Bond analysis performed at Hughes, Ms. Morton may seek to offer the remainder of the emails to demonstrate the complete picture of the analysis.

8

of purposes, and that he often instructed Hughes to do this via email. Accordingly, this email is more than a business communication: it is a record of a specific request for a business-related transaction.

### 2. *DX1002*

Ms. Morton anticipates offering this February 3, 2013 email from Richard Deary (Ms. Morton's business partner at Hughes/Atlantic) to Ms. Morton[3] regarding their business plans as evidence of her state of mind under Rule 803(3) as it demonstrates Ms. Morton's intent to begin an ethically-driven minority-owned business with Mr. Deary. Alternatively, Ms. Morton anticipates offering this document as non-hearsay simply to demonstrate the fact that she and Mr. Deary were communicating about starting a business in early 2013.

### 3. *DX1054*

Ms. Morton intends to offer this August 17, 2014 email from Hugh Dunkerley (a government cooperating witness) to Sylvan Schefler (a Burnham employee) as impeachment evidence in connection with certain anticipated testimony from Mr. Dunkerley.

### 4. *DX1062*

Ms. Morton withdraws this exhibit.

### 5. *DX1076*

Ms. Morton anticipates offering this August 20, 2014 email from Carolyn Lisa (a Hughes employee) to Justin Malkin (a Hughes employee and government witness) and Michael Allen (a Hughes employee) as non-hearsay simply to evidence the fact that this communication was made and to whom it was made, and not for the truth of the statements therein.

---

[3] To be clear, Ms. Morton is a recipient of this email and thus it does not belong in this category. However, for ease of reference, Ms. Morton addresses it in its corresponding order to the government's motion.

6. *DX1078*

Ms. Morton anticipates offering this August 20, 2014 email from Gary Hirst (a defendant and former Chief Investment Officer of Hughes) to Richard Deary as non-hearsay simply to evidence the fact that this communication was made and to whom it was made, and not for the truth of the statements therein.

7. *DX1133*

Ms. Morton withdraws this exhibit.

8. *DX1152*

Ms. Morton anticipates offering this November 11, 2014 email from Richard Deary to Matthew Tuttle (an pension plan consultant) as non-hearsay simply to evidence the fact that these statements were made and not for the truth of the statements therein.

9. *DX1198*

Ms. Morton anticipates offering this March 11, 2015 email from Michael Shearer (an Atlantic employee) to various other Atlantic employees as potential impeachment evidence against certain anticipated testimony.

10. *DX1280*

Ms. Morton anticipates offering this August 29, 2015 email from Andrew Godfrey (a Burnham employee) to Don Trotter and Ron Sellers (Atlantic employees) as potential impeachment evidence against certain anticipated testimony.

11. *DX1287*

Ms. Morton anticipates offering this August 11, 2015 email from Carolyn Lisa to Ron Sellers as potential impeachment evidence against certain anticipated testimony.

### C. Emails in which Ms. Morton is a Sender or Recipient

**1.     *DX1005***

Ms. Morton anticipates offering this June 4, 2014 email from Ms. Morton to Jason Galanis as evidence of her state of mind under Rule 803(3) as it evidences Ms. Morton's intent and plan to begin a Native American initiative with her new business.

**2.     *DX1010***

Ms. Morton anticipates offering this July 6, 2014 email from Ms. Morton to Jason Galanis as evidence of her state of mind under Rule 803(3) as it evidences Ms. Morton's intent and plan to begin a Native American initiative with her new business

**3.     *DX1012***

Ms. Morton anticipates offering this July 12, 2014 email from Ms. Morton to Jason Galanis as evidence of her state of mind under Rule 803(3) as it evidences Ms. Morton's intent to and mental feelings about moving forward with a business venture with Galanis.

**4.     *DX1019***

Ms. Morton anticipates offering this July 21, 2014 email from Ms. Morton to Jason Galanis and Richard Deary as non-hearsay simply for the fact rather than the truth of what is said therein. Alternatively, Ms. Morton anticipates offering this email as evidence of her state of mind under Rule 803(3) as it evidences Ms. Morton's intent and plan to offer Mr. Hirst a greater role at Hughes and her intention that he join Hughes as its CIO.

**5.     *DX1050***

Ms. Morton anticipates offering this August 17, 2014 email from Ms. Morton to Richard Deary as evidence of her state of mind under Rule 803(3) as it evidences Ms. Morton's motive to place the Bonds based in part on Greenberg Traurig's favorable legal opinion concerning the issuance. Alternatively, Ms. Morton anticipates offering this email as non-hearsay simply for the

11

fact that she shared the legal opinion from Greenberg Traurig rather than the truth of that legal opinion.

6. *DX1058*

Ms. Morton anticipates offering this August 18, 2014 email from Carolyn Lisa to Ms. Morton as non-hearsay simply for the fact that an analysis was ongoing regarding the suitability of the Bonds rather than the truth of the analysis. Alternatively, Ms. Morton anticipates offering this email as evidence of her state of mind under Rule 803(3) as it evidences Ms. Morton's intent and plan to continue having Hughes' investment guidelines analyzed as they learned more information about the Bonds.

7. *DX1087*

Ms. Morton anticipates offering this August 22, 2014 email from Ms. Morton to various Hughes employees as non-hearsay simply for the fact that this communication was sent addressing Hughes' systems.

8. *DX1088-1090 and 1099-1111*

Ms. Morton anticipates offering these letters to Hughes' investors as business records. Alternatively, Ms. Morton anticipates offering these letters as non-hearsay simply for the fact that they were sent and that, where relevant, they disclosed the Bonds.

9. *DX1132*

Ms. Morton anticipates offering this October 5, 2014 email from Ms. Morton to Ron Sellers, Josh Bogart, and Richard Deary as non-hearsay simply for the fact that a Hughes-Atlantic term sheet existed in October 2014.

10. *DX1160*

Ms. Morton withdraws this exhibit.

11. *DX1165 and 1168*

Ms. Morton anticipates offering these series of text messages between Ms. Morton and Jerry Thunelius as a combination of non-hearsay simply for the fact that some statements were made and under the state of mind exception in Rule 803(3). Moreover, the government intends to admit the extraction report from Ms. Morton's iPhone, which contains all of these text messages in a different (and less user-friendly format). Accordingly, these text messages are likely to come into evidence through the government.

12. *DX1195*

Ms. Morton anticipates offering this March 6, 2015 email from Ms. Morton to Jerry Thunelius as non-hearsay simply for the fact that she sent the information contained therein to Thunelius, not for the truth of the information.

13. *DX1210*

Ms. Morton anticipates offering this April 10, 2015 email from Ms. Morton to Cliff Cole and Mike Dineen (Atlantic employees) as non-hearsay simply for the fact that she sent the information contained therein to these individuals, not for the truth of the information.

14. *DX1216*

Ms. Morton anticipates offering this April 12, 2015 email from Ms. Morton to Don Trotter as non-hearsay simply for the fact that the communication occurred.

15. *DX1239*

Ms. Morton anticipates offering this May 1, 2015 email from Ms. Morton to various Hughes employees for impeachment purposes against certain anticipated testimony.

16. *DX1241*

Ms. Morton anticipates offering this May 3, 2015 email from Ms. Morton to various Atlantic employees as evidence of her state of mind under Rule 803(3) as it evidences Ms.

Morton's contemporaneous a mental feeling about certain facts regarding Atlantic Asset Management's practices and her intent toward Mike Smith (a government witness).

### 17. *DX1263 and 1264*

Ms. Morton anticipates offering this June 15, 2015 email from Ms. Morton to Devin Wicker (Bonwick employee), Leo Griffin (a Hughes client representative) and Philip Guess (a lawyer) as evidence of her state of mind under Rule 803(3) as it evidences Ms. Morton's intent to sell the Bonds to Bonwick.

### 18. *DX1284*

Ms. Morton anticipates offering this August 3, 2015 email from Ms. Morton to Mike Smith (an Atlantic client representative) as evidence of her state of mind under Rule 803(3) as it evidences Ms. Morton's intent to sell the Bond to Bonwick.

### 19. *DX1290*

Ms. Morton anticipates offering this August 13, 2015 email from Carolyn Lisa to Ms. Morton, Mr. Deary, Mr. Sellers, and Mr. Trotter as evidence of her state of mind under Rule 803(3) as it evidences Ms. Morton's intent to have several individuals working to remove the Bonds from the GYOF account.

### D. **Folders Containing Compilations of Notes, Memos, and Other Information**

### 1. *DX1000*

Ms. Morton anticipates offering this compilation as non-hearsay simply for the fact that it existed. Further, Ms. Morton also intends to introduce it as a business record, just like the government has asked Ms. Morton to stipulate to a similar document (GX910) which it intends to introduce as a business record.

14

    **2.**    *DX1254*

Ms. Morton anticipates offering this compilation as non-hearsay simply for the fact that it existed. Further, Ms. Morton also intends to introduce it as a business record, just like the government has asked Ms. Morton to stipulate to a similar document (GX910) which it intends to introduce as a business record.

    **E.**    **Emails Regarding Ms. Morton's Assistance to Law Enforcement**

    **1.**    *DX1293, 1294, and 1295*

Ms. Morton anticipates offering these emails to Agent Shannon Bieniek as non-hearsay simply for the fact that she sent them and not for the truth of the content. Alternatively, Ms. Morton anticipates offering this email as evidence of her state of mind under Rule 803(3) as it evidences Ms. Morton's intent to assist the government.

    **2.**    *DX1296*

Ms. Morton anticipates offering this email from Agent Adam Fascio (a government witness) to AUSA Andrew Bauer and AUSA Brian Blais as statements of a party opponent. In the alternative, Ms. Morton anticipates offering them as non-hearsay simply for the fact that she sent it and not for the truth of the content.

    **3.**    *DX1304*

Ms. Morton anticipates offering this November 2, 2015 email to Tejal Shah of the SEC as non-hearsay simply for the fact that she sent it and not for the truth of the content. Alternatively, Ms. Morton anticipates offering this email as evidence of her state of mind under Rule 803(3) as it evidences Ms. Morton's intent to assist the SEC.

    **4.**    *DX1308*

Ms. Morton anticipates offering this voicemail from David Greene of FINRA left on Ms. Morton's cell phone as evidence her state of mind in that it demonstrates her intent and plan to contact the government to report Galanis and others.

## CONCLUSION

For the foregoing reasons, Michelle Morton respectfully requests that the Court grant the relief requested herein.

Dated:  New York, New York
         May 11, 2018

                      Respectfully submitted,

                      ORRICK, HERRINGTON & SUTCLIFFE LLP

                      By:   /s/ Gregory Morvillo
                      Gregory Morvillo
                      Savannah Stevenson
                      Caitlin Sikes
                      51 West 52nd Street
                      New York, New York 10019
                      (212) 506-5000

                      *Attorneys for Defendant Michelle Morton*