USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 10/20/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

MICHELLE MORTON,

    Defendant.

---

No. 16-CR-371-5 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

On May 16, 2018, six days prior to the scheduled start date of trial, Defendant Michelle Morton pled guilty to conspiracy to commit securities fraud and investment advisor fraud. On July 20, 2018, after the trial of her co-defendants (from whom she had previously sought severance) had ended, Morton moved to withdraw her guilty plea, arguing that it had not been knowingly and voluntarily made. The Court denied Morton's motion, noting, among other things, that Morton—who appeared remarkably calm, collected, and poised at the plea proceeding—had clearly allocuted that she understood what she was pleading to and the potential consequences of her decision. Morton raised no issues regarding her attorneys or their legal representation of her in that July 2018 motion. In late 2018, however, two days before she was scheduled—for the second time—to be sentenced, Morton informed the Court that she desired new counsel, and on May 17, 2019, she filed a second motion to withdraw her guilty plea—the instant motion. In this second motion, Morton claims for the first time that her prior attorneys coerced her into pleading guilty despite knowing and believing that she was innocent, and that they rendered ineffective assistance of counsel.

In March 2020, the Court held a four-day evidentiary hearing, during which it heard extensive testimony from Morton's prior counsel, as well as from her pretrial services officer.

Morton herself did not testify.  At the conclusion of the hearing, the Court found both her prior attorneys to be credible witnesses, as well as zealous advocates who had vigorously represented Morton over the course of almost two years.  The Court determined that, contrary to Morton's assertions, neither attorney had encouraged, persuaded, or coerced her to plead guilty, nor did either believe her to be innocent when she did so.  Rather, the Court concluded that Morton "appear[ed] to be a skilled manipulator."  The Court nonetheless asked the parties to file additional submissions addressing Morton's preparedness for her plea hearing.  Now, after considering the parties' multiple filings, as well as the hearing testimony, the Court concludes that Morton was not coerced into pleading guilty, that her plea was voluntary, knowing, and intelligent, and that her prior counsel did not render ineffective assistance of counsel.  Accordingly, Morton's motion to withdraw her plea is, again, denied.

## BACKGROUND

The facts of this case have been detailed in various prior opinions, *see* Dkts. 568, 690, and the Court therefore includes only those facts necessary to resolve the instant motion.

Michelle Morton was arrested on May 11, 2016, following the filing of a sealed Complaint charging her with conspiracy to commit securities fraud, securities fraud, conspiracy to commit investment adviser fraud, and investment adviser fraud.  Dkts. 1, 6.  On May 31, 2016, an indictment was filed against Morton and her co-defendants, charging her with the same four crimes. Dkt. 22.  In early 2017, after first working with an attorney hired pursuant to the Criminal Justice Act, Morton retained Gregory Morvillo, Eugene Ingoglia,[1] and Savannah Stevenson, then at Morvillo LLP, to represent her.  Dkt. 149.

---

[1] Because Mr. Ingoglia did not ultimately play a significant role in Morton's defense, his conduct is not relevant with respect to this motion.

I.      **Morton's Guilty Plea**

On May 16, 2018, six days prior to the start of trial and following extensive pre-trial and *in limine* motion practice, Morton entered a guilty plea to two counts in the indictment: (1) conspiracy to commit securities fraud and (2) investment advisor fraud. *See* Dkt. 503 ("Plea Tr."). At the plea hearing, the Court questioned Morton about recent physical ailments that she claimed to have suffered, her general mental state, and any medication that she was taking. *See id.* at 4-6. Although Morton acknowledged that she had been treated for mental illness three decades ago, she affirmed that this had no effect on her mental state or in any way affected her ability to enter a knowing and voluntary guilty plea. *See id.* at 4.  In particular, Morton testified that there was "nothing" about her health condition that affected her understanding of what was happening in the proceeding. *Id.* at 5.

Morton further testified that she had had sufficient time and opportunity to discuss her case with her counsel, and that she had "discussed with them the nature of the charges, any possible defenses [she] may have, and the rights that [she would] be giving up if [she] pled guilty." *Id.* at 5-6.  The Court nonetheless explained the constitutional rights that Morton was giving up by entering a guilty plea. *See id.* at 6-9.  Morton was also asked if she was satisfied with her counsel's representation, to which she responded that "[i]t has been excellent" and that she was "very satisfied." *Id.* at 6.

During the proceeding, the Court ensured that Morton understood the consequences of her guilty plea.  The Court explained that the maximum term of imprisonment to which Morton could be sentenced was five years in prison for each count, meaning that the "total maximum term of imprisonment" to which she could be sentenced was ten years in prison. *Id.* at 11-12, 13-14. Morton testified that she understood these terms. *Id.*  Morton also testified that she understood

that any term of imprisonment may be followed by a term of supervised release for up to three years, *id.* at 12, 14, and that her sentence may also include certain financial penalties, *id.* at 13-14. Morton affirmed that she had discussed the sentencing guidelines with her attorneys and that she understood that those guidelines serve as recommendations to the Court. *Id.* at 15-16. The Court, nonetheless, specifically explained that it was "required to consider the recommendations of the federal sentencing guidelines" in determining Morton's sentence, and that while it "must take into account the sentencing guidelines," it was also "required to give the sentence that [it] believes best satisfies the purposes of the criminal law, even if it's higher or lower than the guidelines recommendation." *Id.* at 15.

As to her plea agreement, Morton confirmed that she read the agreement prior to signing it, that she discussed it with her attorneys, and that she understood "all of the terms of [the] agreement" after doing so. *Id.* at 16. The Government subsequently summarized the main terms of the agreement, explaining that the parties had "agreed and stipulated to a guidelines range of 135 to 168 months imprisonment," but that because the "statutorily authorized maximum sentence" for the two counts is 120 months imprisonment—i.e., "less than the minimum of the applicable guidelines range"—the maximum sentence for both counts was 120 months. *Id.* at 17. The Court separately ensured that Morton understood that she was giving up her right to appeal or otherwise challenge her sentence as long as she was sentenced to 120 months or less, as well as that she was giving up certain other rights of appeal. *Id.* at 18.

As the proceeding progressed further, Morton was questioned about the specific counts against her. Morton testified that she "willingly" signed the plea agreement, and denied being offered "any inducement to plead guilty" to these counts, or being "threatened, bribed, or forced [] to sign the plea agreement or to plead guilty." *Id.* at 19. Morton also confirmed that no one had

made any promise to her about what her sentence would be. *Id.* She further confirmed that she understood that any prediction as to what her sentence would be could be wrong, and that she would not be able to withdraw her plea on the basis that her sentence is different from what she hoped for or expected. *Id.*

The Court then asked Morton to explain, in her own words, what she did to make her "guilty of [the] crimes." *Id.* at 20. In response, Morton stated that, "[i]n or about April 2015," while she "was chief executive officer of a registered investment adviser known as Atlantic Asset Management[,]" she had "agreed with others to purchase certain bonds for a client account at Atlantic," knowing "there was a material conflict of interest in connection with the bonds," and she "did not disclose [the conflict] to the client before making the purchase." *Id.* Morton stated that "[t]his was wrong for [her] to do," as it "enabled Jason Galanis," the principal conspirator in the case, "to steal the bond proceeds through a broader fraud that [she] did not know anything about and, therefore, [her] investors lost money." *Id.* The Government then summarized its proof against Morton, *id.* at 21-22, and her attorneys also confirmed that, from their perspective, "there [was] a sufficient factual predicate" for her guilty plea to the two counts, *id.* at 21.

Overall, as the Court noted in its prior opinion, Morton remained "remarkably calm, collected, and poised" throughout the entirety of the plea hearing. *See* Aug. 17, 2018 Order, Dkt. 568, at 2.

## II. Morton's First Motion to Withdraw

On June 14, 2018, almost a month after the trial of her co-defendants had begun, Morton submitted an *ex parte* letter informing the Court that she intended to file a motion to withdraw her plea. Still having not received Morton's motion by July 9th, the Court ordered her to submit it no later than August 3, 2018. *See* Dkt. 539. After being advised that Morton also refused to cooperate

with the preparation of her presentence report until her anticipated motion was resolved, however, the Court ordered her to submit the motion by July 20, 2018 in order to provide sufficient time for the preparation of the report in the event that it was denied.  *See* Dkt. 542.

On July 20, 2018, over three weeks after the completion of her co-defendants' trial, Morton moved to withdraw her guilty plea on the basis that it had not been knowingly and voluntarily made.  *See* Dkt. 548; *see also* Def. First Mot., Dkt. 549, at 2 (arguing that "she had deluded herself and that entering a guilty plea was a reaction to the stresses in her life—not an honest acknowledgment of wrongdoing").  The Court denied this motion on August 17, 2018.  *See* Aug. 17, 2018 Order.  First, the Court emphasized the "peculiar timing of the events relating to Morton's plea."  *Id.* at 4.  As the Court recounted, "Morton entered her plea on May 16, six days before the scheduled start date of her trial," but then later claimed that she had "had an epiphany of sorts a mere two days [after her plea]."  *Id.*  By waiting to file her withdrawal motion, the Court noted, Morton had successfully avoided going to trial with her co-defendants.  *See id.*  Second, the Court rejected Morton's argument that her physical ailments, financial difficulties, and family troubles had resulted in a "momentary lapse into self-delusion about her guilt."  *Id.* at 5-6.  The Court found that Morton had made clear at her plea allocution that she understood what she was pleading to and the potential consequences of her decision.  *Id.* at 4-6.  According to the Court, this "weigh[ed] heavily against withdrawal."  *Id.* at 5.  Finally, the Court determined that the prejudice to the Government should also preclude Morton from withdrawing her plea.  *See id.* at 7-8.  Specifically, the Court stated that re-trying Morton would force the Government "to duplicate its trial preparation," and, as would be greatly to her advantage, Morton had "had a full preview of the government's case and trial strategy."  *Id.* at 7.  For all of these reasons, the Court concluded that Morton had not "offered a single compelling reason to permit withdrawal of her plea."  *Id.* at 8.

The Court scheduled Morton's sentencing for November 30, 2018. The day of the sentencing, however, Morton informed the Court that she had a medical emergency, and could not appear before it. The Court subsequently adjourned Morton's sentencing date to December 21, 2018. On December 19, 2018, Morton's attorneys informed the Court that Morton no longer wanted them to represent her, and that she was considering taking action against them for legal malpractice. *See* Dkt. 712 ("Dec. 21, 2018 Tr.").

On December 21, 2018, the Court held a conference with Morton and her attorneys. *See id.* At this conference, the Court agreed to give Morton until January 11, 2019 to find new counsel to represent her at sentencing. *See id.* at 10.[2] On January 14, 2019, Morton's present counsel was assigned to her pursuant to the Criminal Justice Act. *See* Dkt. 726. Shortly thereafter, Morton's new counsel informed the Court that it planned to file a second motion to withdraw her guilty plea.

## III.  The Instant Motion

Morton filed the instant motion on May 17, 2019. Dkt. 754. The Government responded on August 8, 2019, Dkt. 794, and Morton replied on October 28, 2019, Dkt. 815.[3] On November 6, 2019, the Government filed a letter requesting leave to file a sur-reply "to respond to new arguments" made by Morton in her reply brief, which the Court granted. The Government filed its sur-reply on November 27, 2019, Dkt. 830, and Morton filed her response to the sur-reply on December 11, 2019, Dkt. 832.[4]

---

[2] According to the docket, Morvillo and Stevenson's representation was terminated on January 9, 2019.

[3] Morton's time to reply was extended so as to allow her to receive additional discovery from her prior counsel's law firm.

[4] In connection with her filings, Morton also provided the Court with numerous text and email communications between herself and her prior counsel.

### A.  Morton's Claims

Morton primarily argues that her former attorneys, Gregory Morvillo and Savannah Stevenson ("prior counsel"), "coerced her to plead guilty despite her innocence in this case, and then suborned her false guilty plea," rendering her plea involuntary and therefore invalid.  *See* Def. Mot., Dkt. 755, at 1.

### 1.  Coercion

According to Morton, "[f]rom the inception of her relationship with Mr. Morvillo and Ms. Stevenson," she made clear that she was innocent, and "Mr. Morvillo and Ms. Stevenson repeatedly told Ms. Morton that they believed in [her] innocence and that they could prevail at trial."  *Id.* at 3; *see also* Morton Decl., Dkt. 756, ¶¶ 4, 16.  Morton states that "Morvillo made concerted efforts on [her] behalf," including presentations to the Government asserting Morton's innocence, as well as a motion to dismiss the underlying indictment against her.  Def. Mot. at 3; *see also* Morton Decl. ¶¶ 5, 7.  In rejecting a plea offer made by the Government in the fall of 2017, Morvillo apparently "inform[ed] the government that [Morton] could not plead guilty because she had not committed any crime."  Def. Mot. at 3.

Morton contends that, in March and April 2018, Morvillo and Stevenson urged her to undergo a series of medical tests resulting from "severe bleeding and extreme weakness."  *See* Morton Decl. ¶ 8.  According to Morton, after these tests revealed that she was suffering from "dangerously elevated blood pressure and an enlarged heart," Def. Mot. at 4, Morvillo and Stevenson suggested, "for the first time," that she consider pleading guilty, *id.* at 5.  Specifically, Morton alleges that, at a meeting on May 9, 2018, Morvillo took her hand and told her that he could "make this all go away."  Morton. Decl. ¶¶ 14-15.  Morvillo then allegedly explained that: (1) Morton might not survive a lengthy trial; (2) she might "take [her] own life" during the trial;

(3) "people plead guilty to crimes that they did not commit all the time"; (4) "if it were him, he would plead guilty"; and (5) he doubted that he could secure an acquittal for her. *Id.* ¶¶ 15-16.

In the days following that meeting, Morton contends that she "struggled greatly with the seemingly impossible choice her attorneys had presented to her – plead guilty to a crime she had not committed, or risk dying during a lengthy trial." Def. Mot. at 6.  On May 12, 2018, Morvillo informed Morton that one of her co-defendants had pleaded guilty, and that she therefore needed to make a decision as soon as possible.  *Id.*  In response, Morton authorized Morvillo to "ask for a plea offer from the government." *Id.*  Thereafter, Morvillo "continued to emphasize to Ms. Morton that she needed to make a decision regarding her plea, despite the fact that she was not feeling well or thinking clearly." *Id.*  On May 14, 2018, Morton decided to take the plea offer extended by the Government, "following the advice of her attorneys and believing the risks to her heath resultant from a trial were too great to bear." *Id.*

According to Morton, on May 15, 2018, the day before her plea, Morvillo and Stevenson presented her with an allocution to read at the hearing.  *See id.*  Morton asserts that she immediately told her attorneys that she "wanted to incorporate one important line into the allocution – specifically, that she had relied on the expert guidance of [] investment and compliance professionals," and therefore was not culpable for the conduct with which she was charged.  *Id.*; *see also* Morton Decl. ¶ 23.  When she met with Morvillo on the morning of May 16th, however, Morvillo informed her "that if they included her requested language, the Court would reject her plea." Def. Mot. at 7; *see also* Morton Decl. ¶ 24.  Morton contends that, at that moment, it became clear to her that, in order to protect her health and wellbeing, "she would have to lie under oath." Def. Mot. at 7.

### 2.   Declaration Submitted with Morton's First Motion

According to Morton, just "hours after her guilty plea," she informed Morvillo and Stevenson that she regretted her decision to plead guilty.  *Id.*  Although Morvillo told her that such feelings were normal and that she would get over them, she claims that she remained troubled by her decision, and that through the end of May 2018, she frequently expressed her discomfort to Morvillo and Stevenson, as well as to her pretrial services officer.  *See id.* at 7-8; *see also* Akinyemi Decl., Dkt. 758, at 2.  According to Morton, it was not until June 9, 2018 that her prior counsel informed her that she could petition to withdraw her guilty plea.  *See* Def. Mot. at 8.  Upon learning of this possibility, Morton asserts that she immediately asked them to do so, and they began drafting her declaration in support of the motion.  *See id.*

Rather than revealing "the true reason [she] made this decision," Morton contends that the declaration submitted with her first motion "falsely stated that she temporarily deluded herself into believing she was guilty."  *Id.* at 9; *see also* Morton Decl. ¶ 33.  Morton contends that she asked Morvillo and Stevenson to add language "regarding the fact that she had lacked the intent to commit any of the charged crimes," and regarding articles Morvillo had apparently told her about that described "the phenomenon of innocent people pleading guilty."  Def. Mot. at 9; *see also* Morton Decl. ¶ 34.  According to Morton, however, her prior counsel neither "correct[ed] the false statements regarding the reason for her guilty plea," nor did they "include Ms. Morton's requested language."  Def. Mot. at 9-10.

### 3.   Payments to Morton

Finally, Morton contends that, following her arrest in this case, she and her family suffered "devastating financial consequences."  *Id.* at 11.  As a result, on several occasions, Morton asked Morvillo and Stevenson to loan her money.  *Id.*  They apparently agreed to do so, "and between

February 2017 and May 2018, paid a total of approximately $12,400 to Ms. Morton and her parents, which they used for personal expenses." *Id*. According to Morton, "[t]he final such payment – of $1,200 – was sent by Ms. Stevenson to Ms. Morton on May 9, 2019," the same day that Morvillo and Stevenson recommended that she plead guilty. *Id.*; *see also* Morton Decl. ¶ 47. Thus, Morton asserts, "[t]hese payments, although likely made with benevolent motives, [further] clouded [her] judgment, making it more difficult for her to ignore her attorneys' advice when they encouraged her to plead guilty despite her innocence." Def. Mot. at 12; *see also* Morton Decl. ¶ 48.

### B. The Government's Response

The Government, relying on affidavits submitted by Morvillo and Stevenson, paints a very different picture. According to the Government, leading up to trial, "Morton was frequently unwilling to discuss the facts of her case with" Morvillo and Stevenson. Gov't Opp'n, Dkt. 794, at 8. On April 30, 2018, however, Morton admitted to Morvillo and Stevenson that she was aware that she had misled investors, and stated that she had done a "bad thing for a good reason." *Id.* at 9. Stevenson attests that she and Morton spoke on the phone the following day, and that Morton referenced "the possibility of 'fall[ing] on [her] sword,'" and again "expressed the idea that she had done something wrong." *Id.* at 9-10. Based on Morton's admissions, their review of the 3500 material and Rule 16 discovery, and Morton's continuing health issues, her prior counsel "decided to raise with Morton the possibility of a guilty plea." *Id.* at 10.

According to Morvillo and Stevenson, they did so for the first time on May 3, 2018. *See id.* In response, Morton supposedly stated that she had already considered a guilty plea, but wanted more time to think about it. *See id.* Both Morvillo and Stevenson assert that, at "no time during this meeting, and at no time subsequent to this meeting, did [they] advise, recommend, counsel, or

otherwise encourage Morton to plead guilty." *Id.*   Rather, on May 12, 2019, Morvillo and Stevenson obtained Morton's express authorization to contact the Government about a possible plea, and, following "numerous communications with Morton regarding the plea offer," she agreed to accept the offer. *Id.* at 10-11.   Morvillo also attests that, although Morton texted him with an "addition to [her] allocution" "late on May 15," he made clear that this addition "shift[ed] responsibility and create[d] a risk the plea would not be accepted," and Morton thus "agreed to remove the language." *Id.* at 11.

Morvillo and Stevenson also deny that they delayed—or concealed—telling Morton that she could withdraw her guilty plea.   Morvillo asserts that twelve days after Morton pleaded guilty, she informed him, for the very first time, that "she could not live with her decision to plead guilty." *Id.* at 14.   Nevertheless, she "did not state she was innocent, that she had lied to the Court, or that she had felt pressured to plead guilty." *Id.*   According to Morvillo, it was not until June 14, 2018 that Morton formally informed him that she wanted to withdraw her guilty plea, and he and Stevenson began preparing the appropriate motion papers immediately thereafter. *See id.* at 15.   Prior to filing the motion papers with the Court, Stevenson sent Morton the drafts to review. *See id.*   At that point, rather than suggesting or questioning whether her declaration was accurate, Morton confirmed that it was "accurate and fine." *Id.*

Finally, Morvillo and Stevenson deny that they made any payments to Morton or her family so as to influence her to plead guilty.   Morvillo asserts that he had "hired Morton in her personal capacity to do work [on a book project] unconnected with his law firm," in which he agreed to pay her $6,000 upfront. *Id.* at 17.   Although Morton failed to perform any work for him, Morvillo states that he allowed her to keep the money because he "knew she had no income, and she claimed to have sent the money [he] gave her directly to the tax authorities." *Id.*   According to Stevenson,

all of the payments she made were out of "sympathy" for Morton's situation, and not to "influence her decisions about her case, [nor] as a way to persuade her to plead guilty." *Id.* at 17-18.[5]

### C. Evidentiary Hearing

From March 2, 2020 to March 5, 2020, the Court held a four-day evidentiary hearing on Morton's motion. *See* Dkts. 878, 880, 882, 884 ("Hearing Tr."). During the hearing, the Court heard extensive testimony from Morvillo and Stevenson, as well as from Pretrial Services Officer Lea Harmon.

Morvillo and Stevenson testified repeatedly and unequivocally that they did not coerce, encourage, induce, pressure, recommend, advise, instruct, or try to persuade Morton to plead guilty at any time during their representation. *See* Hearing Tr. at 45, 144-45, 153-54, 263, 318, 326-27, 345, 770. They also testified specifically that they did not tell Morton to plead guilty even though she was innocent, *see id.* at 45, 136, 263, 318, 345, 770, and that they believed Morton to be guilty at the time that she pled, *see id.* at 45-46, 145-46, 148, 153, 264, 680. They testified further that it was Morton's decision to plead guilty, and that at no point between when they conveyed the plea offer to her and when the plea proceeding occurred did she indicate that she did not want to go through with the plea or did she claim that she was factually innocent of the charges. *See, e.g., id.*

---

[5] The Government's sur-reply was filed to address "new factual arguments" Morton purportedly raised in her reply brief. *See* Gov't Sur-Reply, Dkt. 830, at 1. In its sur-reply, the Government primarily argues that the contemporaneous record and prior counsel's sworn statements demonstrate that Morton's decision to plead guilty was knowing and voluntary, and not coerced, and that Morton's prior counsel "did their best to represent a difficult client," *id.* at 1-2, including by assisting with her medical care and continuing to prepare for trial up until when she pled guilty. In her response to the Government's sur-reply, Morton argues, based on the "contemporaneous record," that she made "continued assertions of innocence" to her prior counsel "up until the moment her guilty plea proceeding began," and that she was thus "coerced, manipulated, and rushed into pleading guilty." *See* Def. Response, Dkt. 832, at 2. Morton mischaracterizes the record, and her self-serving assertions are belied by the documentary evidence and prior counsel's hearing testimony. Indeed, as the Court previously noted, "the record in this matter is complex and voluminous," and "Morton's effort to identify a sampling of communications that she deems probative of her innocence is thus unpersuasive." Aug. 17, 2018 Order at 5 n.1. Despite the numerous exhibits filed with Morton's motion and reply brief, she has produced no evidence that demonstrates her purported innocence or any coercion on the part of her prior counsel.

at 153, 264, 355, 360-61.  On Morton's guilt in particular, both Morvillo and Stevenson testified that they believed Morton was guilty based on the 3500 material they reviewed and based on certain conversations that they had with Morton in early May 2018, in which she acknowledged that she was aware of certain conflicts of interest.  *See, e.g.*, *id.* at 107, 115-16, 121, 125-26, 128-30, 297-300, 313-15, 445-46, 461, 650, 762, 765, 781.  Morvillo and Stevenson also testified that they had no concerns about Morton entering a voluntary guilty plea when she did so.  *See id.* at 152-53, 349, 356-60.

Although Officer Harmon testified that Morton had "made statements that she believed that she was innocent" and "that she had intended to take her case to trial," *id.* at 16, Officer Harmon also testified that defendants frequently say that they are innocent, *id.* at 32, and that it is "not uncommon for defendants to tell [her] that they plan to go to trial and then several weeks later enter a guilty plea," *id.* at 20.  Officer Harmon did not recall, moreover, any conversations in which Morton told her that she pled guilty even though she was innocent, or that her attorneys forced her to plead guilty or told her to lie to the Court.  *See id.* at 30.  Officer Harmon also admitted that she did not know what conversations Morton did in fact have with her prior counsel.  *See id.* at 31.

Morvillo and Stevenson testified that they never told Morton that "innocent people plead guilty all the time."  *See, e.g.*, *id.* at 318, 326, 345, 675.  To the contrary, any conversations regarding "innocent people pleading guilty" arose in or around February 2017, in connection with a book project that Morvillo had, in his personal capacity, hired Morton to help with.  *See id.* at 384-85.  As part of that work, Morvillo told Morton about the case of one of his CJA clients, Alan West, and in that context, discussed "the notion of Alford pleas and the fact that there are times when innocent people plead guilty."  *Id.* at 385.  Morvillo was clear, however, that this conversation occurred in February 2017, over fourteen months prior to Morton's plea.  *See id.* at

385, 505.  He testified further that he did not discuss "the Alan West case" or "the fact that some innocent people plead guilty" in the same conversation as Morton's own case, and that, other than the initial conversation related to his book project in February 2017, he does not recall having any conversations with Morton prior to her guilty plea about innocent people pleading guilty.  *See id.* at 505, 513.  In particular, he did not recall "having any conversations about Alan West or innocent people pleading guilty in May of 2018."  *Id.* at 509.

While Officer Harmon testified that, according to Morton, her counsel did not think she would survive a trial due to her health, *see id.* at 23-24, 39, she also admitted that aside from Morton telling her this, she had no basis to believe it to be true, and she had not heard such statements from anyone besides Morton herself, *see id.* at 40.  Morvillo and Stevenson, on the other hand, testified that they never told Morton that she would not survive a trial because of her health.  *See id.* at 263, 318, 326, 345, 770.  In fact, they explained that Morton was the one who expressed concern that she would not survive a trial due to her health issues.  *See, e.g., id.* at 318-19.[6]  Morvillo and Stevenson also testified extensively about Morton's consistent refusal to participate in her defense or engage in trial preparation throughout much of their representation.  *See id.* at 47-48, 54, 66-68, 72-73, 79-80, 83-86, 91, 93-95, 98, 100-01, 209-10, 213-14, 267-69, 287, 289-91, 296, 302, 409, 425-27, 430.  They testified further that Morton frequently told them

---

[6] Stevenson also testified that, after Morton began to acknowledge her awareness of the conflict of interest issues, she and Morvillo decided to broach the topic of reaching out to the Government for a plea offer, and to do so without Morton "shutting down the conversation" by "approaching it through the health concerns [Morton] had been experiencing."  *See id.* at 131-32.  As Stevenson explained, "it was [their] experience that if [they] communicated with [Morton] about something in an abrupt way or by introducing a topic that she was uncomfortable with, . . . she . . . would either stop the conversation entirely, she would withdraw, or she would become very angry."  *Id.* at 671.  Stevenson testified that Morton "had a habit of shutting down conversations when they were not approached in a way that she could handle," and that they "needed to be able to ask [the question of whether she wanted them to reach out to the Government] without having her shutdown."  *Id.* at 670.  They therefore "strategically decided" that they would "introduc[e] the idea of resolving the case, or at least contacting the government to see if they'd be willing to resolve the case through a guilty plea" by discussing Morton's health concerns and the "additional stress that she was experiencing because of" her health.  *Id.* at 671.

that there "would not be a trial." *See, e.g.*, *id.* at 48-49, 75-77, 264-65, 276, 409.  Stevenson recalled Morton making such statements "relatively early on" in their communications, and that, in particular, Morton asserted that "there would not be a trial in the case either because the case was going to go away or because she would not be alive for a trial." *See id.* at 49.  Nonetheless, Morvillo and Stevenson continued to diligently prepare for trial even while Morton was considering whether to plead guilty, *see id.* at 132-33, 141, 145, 295, 323, 328-29, 336, 525, 533, 763, and were personally disappointed when she entered her plea because it meant that the trial would no longer happen, *see id.* at 156-58, 328, 436-37.

Morvillo and Stevenson testified about the payments they made to Morton during the course of their representation—made directly in response to Morton's repeated requests for money. *See, e.g.*, *id.* at 180-88, 382-92, 626, 751.  They insisted, however, that these payments did not affect their representation of Morton in the case or her decision to plead guilty.  *See id.* at 188, 389, 630-31.  Indeed, they specifically testified that they did not provide Morton or her family with money in order to affect her decisions in the case, in exchange for any promises related to her case, or in order to persuade her to plead guilty.  *See id.* at 188, 389, 750-51.

While they admitted that the timing surrounding Morton's plea was "tight," *see, e.g.*, *id.* at 699, Morvillo and Stevenson nonetheless testified that Morton was fully advised of the terms contained in her plea agreement and the consequences of her plea, including the sentencing consequences.  Stevenson explained that leading up to the plea proceeding, she and Morvillo had "several conversations" with Morton "about the details surrounding her plea," including about the sentencing guidelines and the statutory cap.  *Id.* at 151.  While Stevenson stated that her practice is to "go paragraph by paragraph through a hard copy of a plea agreement" with her clients and that, because of the "tight time frame between receiving [the] plea agreement and [Morton]

actually pleading guilty," they did not go "paragraph by paragraph" over the agreement with her, she nevertheless believed that both she and Morvillo had "covered all of the points in the plea agreement." *Id.* at 696.  Stevenson testified further that, at the time of Morton's plea proceeding, she did not believe that "there was anything that [they] hadn't covered with [Morton] that [they] needed to," including with respect to the sentencing guidelines and the stipulated guidelines range. *Id.* at 700.  As she explained, her practice was to "cover all of those issues with any defendant who was pleading guilty," and she did not recall feeling that, going into Morton's plea proceeding, they "had not covered any of the things that as a practice [she] would have covered with clients pleading guilty." *Id.* at 700-01.

Similarly, Morvillo testified that he and Stevenson reviewed the plea agreement with Morton "over the course of several days," and that Morton understood the agreement and the terms contained therein because they explained them to her "in great detail" during those conversations. *Id.* at 575.  Although he also had not "taken [Morton] paragraph by paragraph through the actual plea agreement," *id.* at 356, as is his typical practice, he testified that he and Stevenson "went over each paragraph" with Morton before her plea, even if they may not have done so "in one sitting," *id.* at 551-52.  And although he recalled showing Morton the full plea agreement on the morning of her plea—and not necessarily beforehand—he nevertheless testified that they had "covered all of the terms over the course of a couple of days" leading up to the plea, *id.* at 572-73, and that they had had many conversations about the plea and "about what the terms were and about what's contained in the document" during that time, *id.* at 576.[7]  As to the sentencing guidelines in

---

[7] As to why he only sent Morton the signature page of the agreement after receiving it from the Government on May 14, 2018, Morvillo testified that Morton asked not to see the entire agreement, and he was therefore abiding by her request.  *See id.* at 551, 572.  He explained that, although this was not his usual practice, "this was a special case" because Morton "often refused to take documents from [them] . . . [a]nd so when she said, don't send it to me, [he] didn't." *Id.* at 551.

particular, Morvillo confirmed that they "discussed the guidelines numerous times," and that he was "certain" that they discussed the "specific guidelines range" prior to Morton's plea. *Id.* at 579. He also testified that there was no aspect of the plea agreement that he thinks they did not discuss with Morton prior to her plea, *id.*, and that, from his perspective, when Morton stated at the plea proceeding that she had read and understood the agreement, "that [was] actually true because [he] would not have allowed her to say that if it was not true," *id.* at 575.

At the conclusion of the four-day hearing, the Court stated that it found both Morvillo and Stevenson to be "extremely credible witnesses, as well as zealous advocates[,] who were generally very caring and empathetic towards" Morton. *Id.* at 781. The Court noted that, over the course of almost two years in which Morvillo and Stevenson "vigorously represented" Morton, they "went above and beyond their obligations." *Id.* In short, the Court determined that neither Morvillo nor Stevenson "encouraged, persuaded, or coerced [Morton] to plead guilty" or "believed [Morton] to be innocent when she did so." *Id.* The Court also stated that Morton "appears to be a skilled manipulator." *Id.* The Court nonetheless expressed its view that, although certain of their actions may have been done "solely out of compassion," and did not actually affect Morton's decision to plead guilty, Morvillo and Stevenson made some "errors in judgment, including by hiring and giving [] Morton money," and expressed concern that there may also have "been failings with regard to [] Morton's preparation for her plea hearing." *Id.* at 781-82. The Court thus asked the parties to submit post-hearing submissions on these issues, as well as any others that they deemed relevant to the instant motion, in spite of the fact that the Court did not believe Morton had "ever claimed that she did not understand the consequences of her plea." *Id.* at 782.

### D.  Post-Hearing Submissions

On April 2, 2020, the parties submitted post-hearing briefs.  In Morton's post-hearing brief, she argued that, in addition to all of the arguments she set forth in her motion and reply brief, the evidence adduced at the evidentiary hearing established "multiple fair and just reasons" supporting her motion to withdraw her guilty plea.  *See* Def. Post-Hearing Br., Dkt. 873, at 1.  Specifically, Morton asserted that the "undisputed evidence" demonstrated that (1) she "entered a rushed guilty plea amidst mental confusion and enormous stress," (2) she did not have "the opportunity to review the written plea agreement in any detail" and her prior counsel "did not inform her about the Stipulated Guidelines Sentence contained in her plea agreement," and (3) she "almost immediately regretted her decision to plead guilty." *Id.*  According to Morton, these factors constitute additional fair and just reasons for withdrawal.

In its post-hearing brief, the Government responded to the Court's concern regarding Morton's preparation for her plea hearing, and asserted that such issues should not be determinative on this motion.  The Government pointed to the fact that Morton had not previously contended that she was misinformed about the Sentencing Guidelines range or that she did not have an opportunity to read or understand her plea agreement, "let alone that she would not have pleaded guilty had she been advised differently or had additional time."  Gov't Post-Hearing Br., Dkt. 874, at 1.  The Government argued further that, while "Morton had the opportunity to so testify at the Hearing, . . . she did not do so," and she "should not now be heard to complain that she should be permitted to withdraw her guilty plea for yet another, newly hatched reason[.]" *Id.* at 1-2.  The Government also maintained that the four-day evidentiary hearing demonstrated that Morton "entered a knowing and voluntary guilty plea in this case, on her own volition and free from any coercion by counsel or anyone else." *Id.* at 1.

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 11(d)(2)(B), a defendant may withdraw a plea of guilty prior to sentencing if the defendant can demonstrate a "fair and just reason" for withdrawal. "A 'fair and just' reason can be found using four factors: the voluntariness of the plea; the time that elapsed between the plea and the motion; if the defendant claims [her] innocence; and if the government would be prejudiced by withdrawing the plea." *United States v. Goode*, 16-CR-00529-01 (NSR), 2018 WL 6698676, at \*6 (S.D.N.Y. Dec. 20, 2018) (citing *United States v. Doe*, 537 F.3d 204, 210 (2d Cir. 2008)). The defendant bears the burden of demonstrating that there are valid grounds for the withdrawal, *see United States v. Gonzalez*, 300 F. App'x 39, 40 (2d Cir. 2008), and in particular, of demonstrating a "significant question" with respect to whether her plea was voluntary, *see Doe*, 537 F.3d at 211. "The standard is strict," and "[m]ost pleas that are not induced by threats or misrepresentations or entered into by those mentally incapable of rationally deciding their best course of action, are upheld as voluntary." *Goode*, 2018 WL 6698676, at \*6 (citing *United States v. Davis*, 906 F. Supp. 2d 305, 310 (S.D.N.Y. 2012), *aff'd,* 607 F. App'x 112 (2d Cir. 2015)). As the Second Circuit has made clear, "a plea . . . is deemed 'voluntary' if it is not the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weigh [her] options rationally." *Miller v. Angliker*, 848 F.2d 1312, 1320 (2d Cir. 1988) (citing *Brady v. United States*, 397 U.S. 742, 750 (1970)).

"Notwithstanding the broadness of Rule 11, courts have observed that a guilty plea is a grave and solemn act, not to be entered into or withdrawn lightly." *United States v. Boamah*, No. 14-cr-0673 (ALC), 2017 WL 2799164, at \*4 (S.D.N.Y. June 26, 2017) (internal quotation marks and citation omitted). Indeed, "society has a strong interest in the finality of guilty pleas, and

allowing withdrawal of pleas not only undermines confidence in the integrity of our judicial procedures, but also increases the volume of judicial work, and delays and impairs the orderly administration of justice." *Doe*, 537 F.3d at 211 (quoting *United States v. Maher*, 108 F.3d 1513, 1529 (2d Cir. 1997)). A district court has broad discretion to decide whether to grant a defendant's motion to withdraw her guilty plea. *See United States v. Figueroa*, 757 F.2d 466, 475 (2d Cir. 1985); *Goode*, 2018 WL 6698676, at *5.

Additionally, a defendant's self-incriminating statements made under oath at her plea hearing are deemed to "carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). A defendant's subsequent assertion of conclusory statements that simply contradict what was said during the plea allocution are thus insufficient to withdraw a guilty plea. *See United States v. Torres*, 129 F.3d 710, 715 (2d Cir. 1997). In determining whether a guilty plea was entered into knowingly and voluntarily, a district court is entitled to rely on and accept as true the defendant's sworn statements made at the plea allocution, "including statements that the defendant was previously satisfied with counsel and understood the terms of the plea agreement." *United States v. Shereshevsky*, No. 08 Cr. 1092-02 (DC), 2015 WL 13229502, at *4 (S.D.N.Y. Dec. 16, 2015) (citing *United States v. DeJesus*, 219 F.3d 117, 121 (2d Cir. 2000) (per curiam)).

## DISCUSSION

### I.   Whether Morton's Guilty Plea Was Involuntary or Coerced

Morton first contends that her prior counsel improperly coerced her into pleading guilty, rendering her guilty plea involuntary and thus invalid. Morton argues that Morvillo and Stevenson coerced her to plead guilty in several ways. First, according to Morton, her prior counsel "exerted mental coercion by advising [her] that she might not live through a rigorous federal trial." Def. Mot. at 18. Second, Morton asserts that Morvillo led her to believe that "pleading guilty while

innocent was a common and acceptable choice," and that he himself would make this choice were he in her situation. *Id.* Third, Morton alleges that her counsel "improperly introduced a coercive economic element into the attorney-client relationship by paying [her] more than $12,000 during the course of their representation," which included "$1,200 on the very day when they first suggested that she plead guilty." *Id.* According to Morton, these pressures were all compounded by the fact that she was physically ill and mentally "foggy" during this "critical time period." *Id.* at 19. Additionally, Morton asserts in her post-hearing brief that her plea was not voluntary because it was "improperly entered in 'haste or confusion,'" Def. Post-Hearing Br. at 17, and under circumstances in which Morton was "deprived of critical information" regarding the "sentencing implications of her guilty plea," *id.* at 20.

The Court finds none of Morton's arguments to be availing. As an initial matter, at her plea hearing, the Court thoroughly questioned Morton on whether her plea was voluntary. Specifically, the Court asked Morton if she had been "offered any inducement to plead guilty," or whether she had been "threatened, bribed, or forced" into signing her plea agreement. *See* Plea Tr. at 19. Morton answered no to both questions. Furthermore, as the Court remarked in its prior opinion, Morton exhibited no signs of duress or hesitancy in answering these questions. To the contrary, she remained "remarkably calm, collected, and poised" throughout the entire proceeding. *See* Aug. 17, 2018 Order at 2. Morton also made clear that she understood the consequences of her crime, and fully articulated the factual basis for her plea. Finally, Morton informed the Court that her counsel had been "excellent," and that she was "very satisfied" with their representation. *See* Plea Tr. at 6.

The Second Circuit has found that such facts are sufficient to demonstrate that a defendant's plea was given voluntarily and knowingly. *See Doe*, 537 F.3d at 213 (determining

that defendant's guilty plea was voluntary where defendant "stated that he was entering his plea voluntarily, and not 'as a result of any fear, pressure, threat or force of any kind'"); *Torres*, 129 F.3d at 715 (determining that defendant's guilty plea was "completely voluntary and knowing" where, "[d]uring his plea, he was explicitly asked by the district court judge whether anyone forced him to [plead guilty], to which he responded no," and where he was "given every chance by the district court to raise any concerns, questions or anxieties about the plea"); *see also United States v. Scott*, 569 F. App'x 55, 56 (2d Cir. 2014) (determining defendant's claim that his guilty plea was involuntary to be "belied by his own statements, made under oath during his plea allocution, representing that his plea was knowing and voluntary and was supported by a factual basis, and confirming that he understood the specific rights he was giving up by pleading guilty").

The Court also rejects Morton's claims that her lawyers mentally coerced her into pleading guilty by supposedly telling her, among other things, that she might not live through a trial and that pleading guilty while innocent was a common and acceptable choice. First, both lawyers have denied, under oath, ever making such statements or otherwise advising, recommending, counseling, or encouraging Morton to plead guilty. *See* Gov't Opp'n at 22. During the evidentiary hearing, Morton's prior counsel were questioned extensively over the course of four days. They reiterated—repeatedly and under oath—that they never coerced, encouraged, or advised Morton to plead guilty at any point during their representation, *see* Hearing Tr. at 45, 144-45, 153-54, 263, 318, 326-27, 345, 770; that they never told Morton to plead guilty even though she was innocent, *see id.* at 45, 136, 263, 318, 345, 770; that they never told Morton that innocent people plead guilty all the time, *see id.* at 318, 326, 345, 675; and that they never told Morton that she would not survive a trial, *see id.* 263, 318, 326, 345, 770. Morton's prior counsel also testified unequivocally that they believed Morton to be guilty at the time that she entered her plea, *see id.* at 45-46, 145-

46, 148, 153, 264, 680, and that they had no concerns about Morton entering a voluntary guilty plea when she did so, *see id.* at 152-53, 349, 356-60.   They testified further that it was Morton's own decision to plead guilty, and that at no point between when they conveyed the plea offer to her and when the plea proceeding occurred did Morton indicate that she did not want to go through with the plea or claim that she was "factually innocent of the charges."  *See id.* at 355, 360-61; *see also id.* at 153, 264.   Indeed, as the Court specifically found at the end of the hearing, the record before it demonstrated that neither Morvillo nor Stevenson—both of whom the Court deemed to be "extremely credible witnesses"—"encouraged, persuaded, or coerced [Morton] to plead guilty." *Id.* at 781.  Nor did they "believe[] her to be innocent when she did so."  *Id.*

Morton has not produced any evidence—apart from her own contradictory statements— that her prior counsel suggested that going to trial would potentially threaten her life, or that pleading guilty while innocent was a common and acceptable choice.[8]  Morton had the opportunity to testify in support of these assertions at the evidentiary hearing, and chose not to do so.  In light of the credible and compelling testimony provided by Morvillo and Stevenson, and Morton's history of manipulation in order to avoid the consequences of her own conduct, Morton's self-serving statements in her declaration and the instant motion are insufficient to establish that her prior counsel coerced or encouraged her to plead guilty for any reason.[9]

---

[8] The "[n]ew documentary evidence" filed in connection with Morton's reply brief, *see* Def. Reply, Dkt. 815, at 1; Heller Decl., Dkt. 816, in no way supports Morton's self-serving assertion that her guilty plea was somehow coerced or involuntary.  Indeed, these exhibits contain no evidence that prior counsel "repeatedly suggested" that Morton lie to the Court.  *See* Def. Reply at 21.  Morton's citation to the documentary record on this point is a text message that refers to a draft statement that Morvillo wrote as "drivel." *See id.* at 21 & n.41.  No suggestion of lying is reflected in that message, and Morton fails to cite any other document showing that prior counsel suggested she lie at her plea proceeding or at sentencing.  As the Court noted in its prior opinion, the fact that Morton may have maintained her innocence prior to her guilty plea is "not an unusual occurrence in criminal cases."  Aug. 17, 2018 Order at 4.  Morton's present claims that she is innocent and that her plea was involuntary are both, in any event, "belied by the record." *Id.* This conclusion is further bolstered by the extensive testimony heard during the four-day evidentiary hearing, as described throughout this Opinion.

[9] *United States v. Bayuo*, No. 15 Cr. 576 (JGK), which Morton cites in support of her position, lends no aid to her contention that she involuntarily pleaded guilty.  *See generally* Heller Decl. at Ex. 5, Dkt. 757-5.  In *Bayuo*, Judge

The Court is also unconvinced that Morvillo and Stevenson's payments to Morton influenced her decision to plead guilty. Although these payments were certainly unwise for her lawyers to make, and may even have violated the New York Rules of Professional Conduct,[10] they were not coercive. The payments were made at Morton's request, on the basis that she and her family were in a dire financial situation. Morvillo and Stevenson testified about Morton's repeated and insistent requests for financial assistance throughout the course of their representation, and that they gave her money because they felt sorry for her and were simply trying to help. *See, e.g.*, Hearing Tr. at 180-81, 382-83, 389-90. They testified further that they did not provide Morton with money in order to affect her decisions in the case, in exchange for any promises related to her

---

Koeltl allowed the defendant to withdraw her plea after concluding that she had "pleaded guilty . . . because she felt pressured to do so by her lawyers." *Id.* at 45. Judge Koeltl reached this conclusion on the basis that the "defendant's reluctance to plead guilty was evident at the plea allocution," as made clear by (1) the defendant's need to take multiple recesses after she became "visibly upset and cr[ied] at various times," (2) her continual consultation with her attorneys, and (3) her notable pause when asked if she had been offered any inducements into pleading guilty. *Id.* at 50-52. Judge Koeltl also found it important that the Government did not attempt to "contradict the defendant's allegations" by introducing affidavits from her defense attorneys explaining "that they did not exert any undue pressure on her to plead guilty." *Id.* at 53. No such circumstances are present here. Rather, as stated earlier, Morton remained remarkably calm and collected during her allocution, and expressed no hesitation in pleading guilty or in praising her lawyer's "excellent" representation. Moreover, unlike in *Bayou*, the Court has before it detailed affidavits from both of Morton's prior attorneys, as well as extensive testimony at the hearing—which this Court found to be credible— directly refuting Morton's allegations. The other cases from this district that Morton cites in her motion are similarly inapposite. *See United States v. Encarnacion*, Nos. 10-CR-905 (JSR), 13-CR-30 (JSR), 2014 WL 6769117, at *5 (S.D.N.Y. Nov. 17, 2014) (allowing defendant to withdraw his plea where he had initially denied his guilt at the plea hearing, and only decided to plead guilty after the court "indicate[d] it [would] not accept the plea otherwise"); *United States v. Ramos*, No. 98 Cr. 1038 (SWK), 2005 WL 120230, at *2 (S.D.N.Y. Jan. 20, 2005) (allowing defendant to withdraw his plea where "his own lawyer fail[ed] to provide him with the charging instrument, admit[ted] to rushing him into pleading, [and] apologize[d] to his client in open court" for his legal errors); *United States v. Garcia* No. 03 CR. 1098 (HB), 2004 WL 3019501, at *1 (S.D.N.Y. Dec. 29, 2004) (allowing defendant to withdraw his plea where his counsel admitted that it had not apprised him of the nature and elements of the crime to which he had pleaded guilty, and "it [was] apparent that both the Court and the Government could have done a better job to ensure that the defendant's statements were supplemented with an offer of proof"); *United States v. Moore*, No. 00 CR. 1077 (LMM), 2004 WL 1542262, at *1 (S.D.N.Y. July 8, 2004) (allowing defendant to withdraw his plea where he did "not fully reflect on his options with the assistance of counsel"); *United States v. Franco*, No. 00 CR. 300 (LMM), 2004 WL 21305352, at *6 (S.D.N.Y. June 6, 2003) (allowing defendant to withdraw his plea where the court was concerned that it had given an "impression that it was seeking a very fast disposition of the case," which "may have prevented defendant from taking the time to fully reflect on the options with CJA counsel's assistance, and thus unduly affected his decision to plead guilty").

[10] *See* New York Rule of Professional Conduct 1.8(e) (stating that, with limited exceptions, "[w]hile representing a client in connection with contemplated or pending litigation, a lawyer shall not advance or guarantee financial assistance to the client").

case, or in order to persuade her to plead guilty. *See id.* at 188, 389, 750-51. Although Morvillo and Stevenson's hiring of and giving money to Morton were, in the Court's view, errors in judgment, it nonetheless finds, as it noted at the hearing, that Morton's prior counsel made these payments "solely out of compassion," and "exclusively from a place of decency, generosity, and a genuine concern for her overall well-being." *Id.* at 781-82.

There is also no evidence in the record that these payments were somehow tied to Morton's decision to enter a guilty plea. To the contrary, as the Court found at the hearing, the payments "had no effect on [Morton's] decision to plead guilty." *Id.* at 782. Moreover, as the Government correctly points out, Morvillo's only payment occurred over a year before Morton's plea. And while it is true that Stevenson made a payment to Morton while she was considering whether to plead guilty, Stevenson had also provided payments to Morton prior to this and continued to do so three months thereafter, all of which were explicitly tied to Morton's repeated requests for help regarding her supposed financial difficulties. There is simply no evidence to suggest that either Morvillo or Stevenson had any personal interest in Morton pleading guilty, such that their payments to her were used or intended to coerce her into pleading.[11] Nor has Morton proffered any credible evidence to establish that these payments did in fact lead to her decision to enter a guilty plea.

Finally, the Court rejects Morton's argument that the circumstances surrounding her plea, including the time pressures and prior counsel's purported failure to advise her of certain consequences, rendered her plea involuntary or unintelligent. Morton argues that the "facts adduced at the hearing demonstrate that prior counsel failed to advise [her] about critical aspects of her guilty plea, most notably the 120-month Stipulated Guidelines Sentence that she faced."

---

[11] Indeed, the Court credits both attorneys' testimony that they were personally disappointed that the case did not proceed to trial. *See, e.g.*, *id.* at 156-58, 328, 436-37.

Def. Post-Hearing Br. at 9.  She also argues that she "signed her plea agreement on a day when she was feeling unwell and mentally confused, just minutes after having received it, and without ever having seen the agreement or any of its key terms," *id.* at 5, and that she "entered her guilty plea under enormous time pressure, without the benefit of fully reviewing her written plea agreement," *id.* at 17.  Although it is true that there was a relatively short timeframe between when Morton authorized her prior counsel to seek a plea offer from the Government and when she pleaded guilty, the Court nevertheless concludes that Morton was well aware of the consequences of her plea, including the sentencing implications, at the time that she entered it.

Contrary to Morton's suggestion, the record does not demonstrate that she entered her guilty plea in "haste or confusion."  While the Second Circuit has noted that "a swift change of heart may indicate a plea made in haste or confusion," *see Doe*, 537 F.3d at 213 (alterations, internal quotation marks, and citation omitted), such circumstances are not present here.  Morton contends that she immediately regretted pleading guilty and sought to move to withdraw her plea as soon as she learned she could do so.  *See* Def. Post-Hearing Br. at 10-11, 17.  She omits, however, "the peculiar timing of the events relating to [her] plea"—namely, that although she entered her guilty plea six days before her trial was scheduled to commence and claimed to "have had an epiphany of sorts a mere two days later," she did not notify the Court of her intention to withdraw her plea until after her co-defendants had already begun trial, nor make the motion until after the trial had ended.  *See* Aug. 17, 2018 Order at 4.  "A defendant's desire to withdraw a plea must be communicated unequivocally."  *United States v. Grant*, No. S7 10 Cr. 431 (CM), 2014 WL 4828469, at *7 (S.D.N.Y. Sept. 25, 2014).  "In other words, merely contemplating a motion to withdraw a guilty plea is insufficient to trigger Rule 11(d)(1)."  *Goode*, 2018 WL 6698676, at *8 (alterations, internal quotation marks, and citation omitted).  That Morton may have struggled

internally with her decision to plead guilty in the days and weeks following it does not establish that she "unequivocally" desired to withdraw her plea. And, importantly, she did not move to withdraw her guilty plea on the basis that it was coerced or involuntary, or that her counsel was ineffective, until May 2019—a full year after she entered her plea. In any event, the Second Circuit has also made clear that "timeliness is only one of several factors that a district court should consider in evaluating a motion to withdraw a guilty plea." *United States v. Lam Peralta*, 792 F. App'x 68, 70 (2d Cir. 2019). "Even when defendants quickly request to withdraw their guilty pleas, [courts have] found such requests insufficient when the defendant has not otherwise demonstrated grounds to justify withdrawal." *Id.* at 70-71.

Nor has Morton established that she entered her guilty plea "amidst mental confusion and enormous stress." *See* Def. Post-Hearing Br. at 1. As the Court has previously noted, "stress alone cannot be a basis to withdraw a valid guilty plea," as "virtually every criminal defendant encounters additional sources of stress that flow from a criminal prosecution and its attendant consequences." Aug. 17, 2018 Order at 6. Here, prior to accepting her plea, the Court thoroughly questioned Morton regarding her physical and psychological condition, and Morton affirmed that nothing affected her ability to understand what was happening in the proceedings or otherwise prevented her from entering a knowing and voluntary plea. *See* Plea Tr. at 4-5. Morton also confirmed, under oath, that she had had enough time and opportunity to discuss her case with her counsel, *id.* at 5-6, that she had discussed the plea agreement with her attorneys and had understood all of the terms contained therein, *id.* at 16, and that she was "very satisfied" with her prior counsel's representation of her, *id.* at 6. The Court, moreover, expressly found Morton to be "exceptionally controlled, calm, and collected" at her plea hearing. *See* Aug. 17, 2018 Order at 6; *see also id.* at 1-2 ("Particularly due to the extensive, contentious pre-trial litigation and the fact

28

that this plea was entered on the eve of a lengthy trial, the Court vividly remembers this hearing and its impression of Morton as remarkably calm, collected, and poised."). Based on the Court's own observations and the evidence before it, the Court concludes that Morton's guilty plea was not a product of "mental confusion" or "enormous stress."

The cases cited in Morton's post-hearing brief are inapposite, as the factual circumstances differ significantly from those present here. In *United States v. Ramos*, for instance, the court concluded that withdrawal was appropriate because the "defendant's lawyer acknowledge[d] on the record that he 'rushed' his client into pleading and 'apologize[d] for that.'" *See* No. 98 CR. 1038 (SWK), 2005 WL 120230, at *2 (S.D.N.Y. Jan. 20, 2005). In *United States v. Rowe*, the defendant entered a guilty plea on the same day that he first indicated an interest in doing so, which occurred on the fifth day of his trial. *See* No. 02 CR. 756 (LMM), 2005 WL 659197, at *1, 2 (S.D.N.Y. Mar. 21, 2005). As the defendant testified at a subsequent evidentiary hearing, he had felt "sleepy" and "not focused" at the time of his plea because he had been "brought to the courthouse from detention in Brooklyn during the trial." *Id.* at *2. The court made factual findings that the defendant's hearing testimony was credible, and that withdrawal was appropriate when combined with the "time pressures involved"—i.e., pleading on the same day he first indicated an intent to do so, in the middle of his trial. *Id.* Although Morton's prior counsel acknowledged the "tight" timeframe surrounding her plea, nothing in the record demonstrates that they "rushed" Morton into pleading guilty. To the contrary, they testified unequivocally that the decision to plead guilty was Morton's own, *see, e.g.*, Hearing Tr. at 153, 360, that they had no concerns about her entering a voluntary guilty plea when she did so, *see, e.g.*, *id.* at 152, 360, and that they had had numerous conversations with Morton about her guilty plea over the course of several days leading up to it, *see, e.g.*, *id.* at 151, 575. As Morton did not testify at the evidentiary hearing, the

Court cannot assess the credibility of her current assertions, as the court did in *Rowe*. Finally, in *United States v. Franco*, the court concluded that defense counsel's actions were neither ineffective nor coercive, even despite finding that counsel had "made his view known that, in his opinion, a guilty plea was the best choice" for the defendant. *See* No. 00 CR. 300 (LMM), 2003 WL 21305352, at *4, 6 (S.D.N.Y. June 6, 2003). The court explained that a defense attorney's "blunt rendering of an honest but negative assessment of a defendant's chances at trial, combined with advice to enter the plea, does not constitute improper behavior or coercion that would suffice to invalidate a plea." *Id.* at *4 (quoting *United States v. Juncal*, 245 F.3d 166, 172 (2d Cir. 2001)) (alterations omitted). Rather, the court held that withdrawal was appropriate because of its concern that *the court* may have "inadvertently" given the defendant the "impression that it was seeking a very fast disposition of the case." *Id.* at *6. This is obviously different from the facts present in Morton's case.[12]

The Court concludes that Morton was in fact fully aware of the potential consequences of her plea. Both Morvillo and Stevenson testified that, despite the "tight" timing, *see, e.g.*, Hearing Tr. at 699, they nonetheless fully advised Morton of the terms contained in her plea agreement and the consequences of her plea, including those related to sentencing. For instance, Stevenson testified that she had "several conversations" with Morton "about the details surrounding her plea,"

---

[12] The record here is also not "rife with errors and confusion," as Morton suggests. *See* Def. Post-Hearing Br. at 22. Again, the cases on which Morton relies for this point are inapposite. In both, the court erroneously misinformed the defendant of his sentencing exposure during the plea proceeding. *See United States v. Harrington*, 354 F.3d 178, 184-85 (2d Cir. 2004) (finding that Rule 11 was violated because the district court informed the defendant that a mandatory minimum sentence applied when one did not, and that he faced a maximum sentence of life imprisonment when his actual maximum sentence was 30 years); *United States v. Harrison*, 241 F.3d 289, 291 (2d Cir. 2001) (finding that Rule 11 was violated because the district court erroneously informed the defendant that a mandatory minimum sentence applied where none did). It was for this reason—combined with the district court's other errors, such as failing to inform the defendant that he was obligated to pay restitution, *see Harrington*, 354 F.3d at 186, or failing to address a letter filed by the defendant seeking to withdraw his plea and obtain new counsel, *see Harrison*, 241 F.3d 294—that the Second Circuit remanded these cases with instructions that the defendants be given the opportunity to withdraw their pleas.

including about the sentencing guidelines and the statutory cap in particular, *see id.* at 151, and

that they "covered all of the points in the plea agreement" prior to her plea, *see id.* at 696.

Stevenson also affirmed that, at the time of Morton's plea proceeding, she did not believe that

"there was anything that [they] hadn't covered with [Morton] that [they] needed to," including the

sentencing guidelines and the stipulated guidelines range.  *See id.* at 700-01.  Morvillo similarly

testified that they had "covered all of the terms" contained in Morton's plea agreement, that he had

explained the terms to her "in great detail" over the course of several days leading up to her plea,

*see id.* at 572-73, 575, and that they had discussed the sentencing guidelines "numerous times,"

*see id.* at 579.  He confirmed that, at the time of her plea proceeding, there was no aspect of the

plea agreement that he had not discussed with Morton.  *See id.*[13]  As already noted, the Court found

Morvillo and Stevenson to be "extremely credible witnesses."  *Id.* at 781.  That they were not able

to "recall all the specifics of their conversations" with Morton almost two years later "speaks only

to the great deal of time that has elapsed and to their oath to testify as accurately as possible," as

noted by the Government.  *See* Gov't Post-Hearing Br. at 23.  But nevertheless, as described above,

both attorneys confirmed that they had specifically reviewed the guidelines, among other things,

with Morton.[14]

---

[13] Morton also specifically indicated in her previous filings that her prior counsel had reviewed the applicable sentencing guidelines range, including the Stipulated Guidelines Sentence of 120 months, prior to her plea—even if they did not do so, she contends, "until the morning of her guilty plea." *See, e.g.*, Def. Reply at 13 (emphasis omitted); Def. Response at 7 n.14.

[14] Although Morvillo is undoubtedly mistaken in his belief that a sentencing court "does not have to consider the guidelines range" when determining an appropriate sentence, *see* Hearing Tr. at 559-560, this misconception did not render Morton's guilty plea involuntary.  The law is clear that "[s]entencing entails a two-step procedure.  First, the district court must determine the applicable Sentencing Guidelines range; second, the court must consider that range, along with the other factors listed in 18 U.S.C. § 3553(a), and then 'make an individualized assessment of the defendant based on the facts presented.'"  *United States v. Russell*, 266 F. App'x 23, at *1 (2d Cir. 2008) (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)) (alterations omitted).  But despite Morvillo's misguided view that the Court is not obligated to consider the applicable Guidelines range at sentencing, it is not clear that Morvillo ever shared this particular belief with Morton, or that it in any way affected her plea.  To the contrary, the totality of the evidence before the Court establishes that Morton was aware of her sentencing exposure at the time of her guilty plea—particularly since any errors or incorrect advice provided by her prior counsel in this regard were rectified by the Court and the Government's statements at the proceeding. *See, e.g.*, *United States v. Diaz*, No. 07 Cr. 003 (BSJ), 2009

31

Furthermore, Morton's plea agreement provided that the "total maximum term of imprisonment . . . is 10 years," the "stipulated Guidelines range is 135 to 168 months' imprisonment," and the "Stipulated Guidelines Sentence" is "120 months' imprisonment." *See* Gov't Opp'n Ex. C ("Plea Agreement") at 1, 3. Although Morton now asserts that "the record is unclear as to whether [she] ever received or reviewed a full written copy of her plea agreement before her guilty plea," Def. Post-Hearing Br. at 8, she previously testified under oath that she had in fact reviewed it, discussed it with her counsel, and understood all of the terms contained in the agreement, *see* Plea Tr. at 16. And although Morton now claims that her prior counsel "failed to advise [her] about . . . the 120-month Stipulated Guidelines Sentence that she faced," Def. Post-Hearing Br. at 9, she previously testified that she had discussed the Guidelines with her counsel, that she understood that the Guidelines served only as a recommendation to the Court, and that no one had made any promise to her as to her sentence, *see* Plea Tr. at 15, 19. The Court is entitled to rely on and accept as true Morton's sworn statements from her plea hearing, particularly where she now offers only bald assertions to the contrary. *See Torres*, 129 F.3d at 715; *Shereshevsky*, 2015 WL 13229502, at *4. Additionally, during the plea proceeding, the Government also specifically reiterated that, while parties had "agreed and stipulated to a guidelines range of 135 to 168 months imprisonment," because the "statutorily authorized maximum sentence" for the two counts is 120 months imprisonment—i.e., "less than the minimum of the applicable guidelines range"—the maximum sentence for both counts was 120 months. *See* Plea Tr. at 17. The Government's summary of the agreement during the plea proceeding thus further informed Morton of her sentencing exposure.

WL 4496052, at *3 (S.D.N.Y. Dec. 3, 2009) ("Where the record indicates that a defendant was otherwise aware of the maximum he faced, and that the sentence imposed was within the sentencing court's discretion, the plea is considered voluntary and valid.").

It is also telling that Morton has never before claimed that she did not understand the consequences of her guilty plea, including with respect to her potential sentencing exposure.  As the Government points out, "Morton has by now filed two motions to withdraw her guilty plea, and submitted sworn declarations accompanying both motions.  In neither of those declarations has she contended that she was misinformed about the [Sentencing Guidelines] range applicable in her case, that she did not understand the Guidelines range applicable in her case, or that she was not able to read or understand the plea agreement pursuant to which she pleaded guilty . . . , let alone that she would not have pleaded guilty had she been advised differently or had additional time to read the Plea Agreement."  Gov't Post-Hearing Br. at 1.  Morton affirmed at her plea hearing that she had had sufficient time and opportunity to discuss her case, the sentencing guidelines, and her plea agreement with her counsel, and that she understood all of the terms contained in the agreement.  *See* Plea Tr. at 5-6, 15-16.  In connection with her first motion to withdraw, Morton did not assert that she misunderstood the applicable Guidelines range at the time she pled, or that she did not read, review, or understand any of the terms contained in her plea agreement.  Morton's most recent argument thus appears to be another attempt at manipulating the Court—and perhaps her current counsel—in order to avoid the consequences of her own conduct. Although Morvillo and Stevenson acknowledged that they did not provide Morton with a full copy of her plea agreement until the morning of her plea, or go over the entire agreement with her paragraph-by-paragraph in one sitting, *see, e.g.*, Hearing Tr. at 551-52, the Court is nevertheless satisfied, based on the totality of the evidence in the record, that Morton's prior counsel did review the entirety of the plea agreement with her, and that her plea was neither involuntary nor unknowing.[15]

---

[15] *United States v. Foreman*, No. 96 CR. 1209 (HB), 1997 WL 639025 (S.D.N.Y. Oct. 15, 1997) does not support Morton's claim that her plea was involuntary because she "was not given the opportunity to review her plea agreement

In any event, the Court specifically ensured that Morton was aware of all of the consequences of a guilty plea, including with respect to sentencing. "Rule 11 requires a sentencing court to inform the defendant and to determine that defendant understands any maximum possible penalty and any mandatory minimum penalty, the court's authority to order restitution, and the advisory nature of the sentencing guidelines." *United States v. Bosgang*, 467 F. App'x 27, 30 (2d Cir. 2012). Here, the Court reviewed with Morton the maximum possible penalties that she would face, including imprisonment, fines, and supervised release terms, and Morton confirmed that she understood all of these consequences. *See* Plea Tr. at 11-14. The Court ensured that Morton understood the advisory nature of the Guidelines, explaining that, while it was "required to consider the recommendations of the federal sentencing guidelines" in determining Morton's sentence, "in the end[,] the judge is required to give the sentence that she believes best satisfies the purposes of the criminal law, even if it's higher or lower than the guidelines recommendation." *See id.* at 15. The Court also reviewed the constitutional rights that Morton would be giving up if she entered a guilty plea and certain other consequences, aside from sentencing implications, that she would face—all of which Morton, again, affirmed that she understood. *See id.* at 6-9, 14-15, 18. Finally, the Court confirmed that Morton understood that, by entering into the plea agreement, she was waiving her right to appeal or otherwise collaterally attack her sentence, as long as she received a sentence of 120 months imprisonment or less. *See id.* at 18. Throughout its own questions and the Government's statements, as well as Morton's affirmative responses, the Court

---

in any detail." *See* Def. Post-Hearing Br. at 21. Importantly, the defendant in *Foreman* presented evidence at a hearing to support his contention that "his lawyer did not adequately review the text of the plea agreement and superseding information with him prior to entry of his guilty plea." *Foreman*, 1997 WL 639025, at *1. "[I]n light [of] the evidence presented at [that] hearing," the court found that "the defendant did not understand the nature of the charge that he plead[ed] to, and that his plea was therefore not voluntary." *Id.* Here, Morton has not adequately demonstrated that she did not understand the nature of the charges to which she pleaded, or any other provisions set forth in her plea agreement. As discussed throughout this Opinion, this Court has determined, based on the evidence in the record, that Morton did indeed understand the charges to which she was pleading guilty and the consequences of her plea at the time that she entered it.

ensured that Morton was fully aware of her rights, her potential sentencing exposure, and various aspects of her plea agreement, as required under Rule 11. Morton's definitive statements from her plea hearing—made contemporaneously and under oath—carry more weight than her recent claims to the contrary. *See Blackledge*, 431 U.S. at 74; *Torres*, 129 F.3d at 715. In short, Morton has provided no reason for the Court to disregard the "strong presumption of verity" that attaches to those sworn statements. *See Blackledge*, 431 U.S. at 74.

For all of these reasons, Morton has failed to show that her guilty plea was coerced or involuntary.

## II. Whether Morton's Prior Counsel Provided Ineffective Assistance of Counsel With Respect to Her Guilty Plea

Morton separately contends that Morvillo and Stevenson provided ineffective assistance of counsel by suborning Morton's false guilty plea, and that she should be allowed to withdraw her plea on that basis as well. To the contrary, the Court finds that Morvillo and Stevenson provided diligent, zealous representation throughout the almost two years that they served as Morton's counsel.

"Ineffective assistance of counsel during plea negotiations can invalidate a guilty plea and make granting withdrawal appropriate, to the extent that the counsel's deficient performance undermines the voluntary and intelligent nature of defendant's decision to plead guilty." *Doe*, 537 F.3d at 213 (quoting *United States v. Arteca*, 411 F.3d 315, 320 (2d Cir. 2005)). "To succeed with such a challenge, a defendant must meet the two-part test initially set forth in *Strickland v. Washington*, 466 U.S. 668 [] (1984)." *Ventura v. Meachum*, 957 F.2d 1048, 1058 (2d Cir. 1992). Accordingly, a defendant must show that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's errors," she "would not have pleaded guilty and would have insisted on going to trial." *See Hill v.*

*Lockhart*, 474 U.S. 52, 58-59 (1985); *see also Anthoulis v. New York*, 586 F. App'x 790, 791-92 (2d Cir. 2014) (quoting *Missouri v. Frye*, 566 U.S. 134, 148 (2012)).  Where the defendant's "specific claim is that counsel has misled [her] as to the possible sentence which might result from a plea of guilty, . . . the issue is whether the defendant was aware of actual sentencing possibilities, and if not, whether accurate information would have made any difference in [her] decision to enter a plea." *Arteca*, 411 F.3d at 320 (internal quotation marks and citation omitted).

Here, Morton fails on both *Strickland* prongs.  First, the Court has already rejected Morton's contention that her former attorneys acted unreasonably by pressuring "her to plead guilty despite her innocence."  Morton's ineffective assistance argument fails for this reason alone. *See United States v. Lisi*, Nos. 09 Cr. 948 (NRB), 09 Cr. 1188 (NRB), 2014 WL 1870823, at *8 (S.D.N.Y. May 6, 2014) (finding that, "[f]or motions that allege ineffective assistance of counsel, the 'voluntariness' inquiry is especially critical" because "[a] defendant moving to withdraw a guilty plea must show that 'counsel's deficient performance undermines the voluntary and intelligent nature of defendant's decision to plead guilty'") (quoting *Arteca*, 411 F.3d at 320).  The Court has also already rejected Morton's assertion that she was not aware of her sentencing exposure, and she thus cannot establish deficient performance based on that contention.  Moreover, even if it is true that Morton's prior counsel told her that they did not believe she would be sentenced to "anywhere near" 120 months imprisonment, *see, e.g.*, Hearing Tr. at 560, or that they thought she would instead "get well below the statutory cap," *see id.* at 697, the record also shows that they expressed these beliefs "[w]ith the caveat that there are never any guarantees," *id.*, and that they ultimately explained that "sentencing is solely in the purview of the Court" and that the Court therefore "has the final say," *id.* at 563-64.  Indeed, at the plea hearing, Morton testified that no one had made any promise to her about what her sentence would be, and that she understood

that any prediction of what her sentence would be could be wrong and that she would not be able to withdraw her plea on that basis. *See* Plea Tr. at 19. As with her other contemporaneous and definitive statements from the plea proceeding, these statements carry great weight. *See Torres*, 129 F.3d at 715. In any event, defense counsel's "mere[] estimate[s]," or even "mistaken prediction[s]," of what a defendant's sentence would be does not constitute ineffective assistance, and a defendant is "not entitled to withdraw a guilty plea simply because [her] attorney erroneously predicted [her] sentence." *See United States v. Sweeney*, 878 F.2d 68, 70 (2d Cir. 1989) (citations omitted).

Morton also cannot successfully show that her prior counsel was deficient in their legal representation of her more generally. As Morton herself admits, Morvillo and Stevenson continually advocated on her behalf, filing several pretrial motions, making various presentations to the Government, and remaining in constant communication with her. *See, e.g.*, Def. Mot. at 3. As Stevenson testified, they spent "a substantial amount" of time working on Morton's case, including late nights and weekends, Hearing Tr. at 159, as well as "numerous, numerous hours with [her] on the phone," *id.*, and in other regular communications—"sometimes numerous times per day," *id.* at 672. Morton's prior counsel also continued to diligently prepare for trial even while Morton was contemplating whether to enter a guilty plea. *See id.* at 132-33, 141, 145, 295, 323, 328-29, 336, 525, 533, 763. Furthermore, they continued to zealously represent Morton pro bono even after her insurance funds ran out, and testified that the lack of funds had no effect on their representation. *See, e.g.*, *id.* at 262-63, 292-94, 376.

Finally, even if Morton could demonstrate that her prior counsel had acted unreasonably —which she has not—her ineffective assistance claim would still fail because she has not shown that she would have likely proceeded to trial. In analyzing "whether a defendant would have

decided not to plead guilty and insisted instead on going to trial," courts consider (1) "whether the defendant pleaded guilty in spite of knowing that the advice on which [she] claims to have relied might be incorrect," (2) "whether pleading guilty gained [her] a benefit in the form of more lenient sentencing," (3) "whether the defendant advanced any basis for doubting the strength of the government's case against [her]," and (4) "whether the government would have been free to prosecute the defendant on counts in addition to those on which [she] pleaded guilty." *Chhabra v. United States*, 720 F.3d 395, 408 (2d Cir. 2013) (citing *Arteca*, 411 F.3d at 321-22).

None of these factors weigh in Morton's favor. First, Morton pleaded guilty even though she knew that her plea allocution—supposedly—contained false statements. *See, e.g.*, Morton Decl. ¶¶ 24-25. Second, Morton may benefit from her plea "in the form of more lenient sentencing" because the two counts to which she pled guilty had a statutory maximum of, in total, 10 years, whereas if she had been convicted of all four counts for which she was indicted, she would have faced a higher statutory maximum—given the securities fraud count had a 20 year statutory maximum—and thus a higher guidelines range as well. Finally, Morton has not provided "any basis for doubting the strength of the government's case" against her.

Perhaps even more important, Morton has completely failed to demonstrate that, had she not pled guilty, she would have proceeded to trial. To the contrary, the documentary record and testimony from the evidentiary hearing make clear that Morton was not willing to help her counsel prepare for trial during the majority of their representation. Morvillo and Stevenson testified at length about Morton's steadfast refusal to participate in her defense or engage in trial preparation for much of the time they spent on her case prior to her plea. *See, e.g.*, Hearing Tr. at 47-48, 54, 66-68, 72-73, 79-80, 83-86, 91, 93-95, 98, 100-01, 209-10, 213-14, 267-69, 287, 289-91, 296, 302,

409, 425-27, 430.[16]  Because the record does not support the conclusion that, even with any additional information as to the consequences of her plea, "it is reasonably probable that [Morton] would have proceeded to trial rather than plead guilty," Morton cannot establish that she suffered any prejudice.  *See Arteca*, 411 F.3d at 321.  Morton has thus failed to demonstrate that her prior counsel provided ineffective assistance of counsel with respect to her guilty plea.

### III.  Whether Morton Has Shown a Fair and Just Reason for Withdrawal of Her Guilty Plea

Lastly, Morton argues that, even if the Court finds that her guilty plea was voluntarily made, "she should separately be permitted to withdraw her guilty plea because a 'fair and just' reason exists to justify her motion."  *See* Def. Mot. at 27.  According to Morton, because (1) she has continually professed her legal innocence, (2) her first withdrawal motion was timely filed, and (3) the Government would suffer only minimal prejudice in allowing her to be retried, she "should be given the opportunity to withdraw her guilty plea and challenge the government's proof against her at trial."  *Id.* at 31.  Furthermore, Morton maintains that the evidence adduced at the evidentiary hearing establishes additional fair and just reasons supporting her withdrawal motion, such as that (1) she "entered a rushed guilty plea amidst mental confusion and enormous stress," (2) she did not have the opportunity to review her written plea agreement "in any detail" and her prior counsel "did not inform her about the Stipulated Guidelines Sentence contained her plea agreement," and (3) she "almost immediately regretted her decision to plead guilty."  *See* Def. Post-Hearing Br. at 1.

Morton has not satisfied her burden of demonstrating a valid reason for allowing withdrawal.  "In general, to determine whether the defendant has shown a 'fair and just reason' to

---

[16] According to her prior counsel, Morton also frequently told them that there would be no trial in the case "either because the case was going to go away or because she would not be alive for a trial."  *See id.* at 48-49; *see also, e.g.*, *id.* at 75-77, 264-65, 276.

[withdraw her guilty plea], a district court considers": (1) "whether the defendant has asserted his or her legal innocence in the motion to withdraw the guilty plea," (2) "the amount of time that has elapsed between the plea and the motion (the longer the elapsed time, the less likely withdrawal would be fair and just)," and (3) "whether the government would be prejudiced by a withdrawal of the plea." *United States v. Schmidt*, 373 F.3d 100, 102-03 (2d Cir. 2004) (citation omitted).  As an initial matter, even if the preceding three factors are met, where "a motion to withdraw a plea is premised on involuntariness, the defendant must raise a significant question about the voluntariness of the original plea." *Doe*, 537 F.3d at 211 (quoting *Torres*, 129 F.3d at 715) (internal quotation marks omitted); *see also United States v. Rosen*, 409 F.3d 535, 548 (2d Cir. 2005) ("Where the motion argues that the plea was not voluntary, *a fortiori* the court must focus on voluntariness."); *United States v. Gonzalez*, 970 F.2d 1095, 1100 (2d Cir. 2000) ("The fact that a defendant has a change of heart prompted by his reevaluation of either the Government's case against him or the penalty that might be imposed is not a sufficient reason to permit withdrawal of a plea.").  For the reasons already articulated, as well as those discussed in the August 17, 2018 Order, the Court is satisfied that Morton's guilty plea was entered into knowingly and voluntarily, and that no other "fair and just" reason exists to allow Morton to withdraw her plea.

## CONCLUSION

After four days of hearing testimony and the Court's review of hundreds of pages of documents attached to the parties' briefs, the Court is convinced that Morton's guilty plea was voluntary, knowing, and intelligent, and was by no means coerced.  "The standard for withdrawing a guilty plea is stringent because society has a strong interest in the finality of guilty pleas, and allowing withdrawal of pleas not only undermines confidence in the integrity of our judicial procedures, but also increases the volume of judicial work, and delays and impairs the orderly

administration of justice." *Schmidt*, 373 F.3d at 103 (internal quotation marks and citation omitted).  This standard is especially pertinent to the instant case, where the Court has already been required to spend considerable time and resources on Morton's continued efforts to delay her sentencing date.  Indeed, the record reflects that Morton has repeatedly attempted to manipulate others in order to avoid the consequences of her conduct.  This manipulation must end now.

For all the reasons discussed above, Morton's motion to withdraw her guilty plea is denied.  She shall appear for sentencing on November 18, 2020 at 11:00 a.m.  To the extent that Morton seeks to file any additional sentencing submissions, she shall do so no later than November 3, 2020.  The Government shall file any additional submissions no later than November 10, 2020.  In advance of sentencing, Morton shall advise the Court whether she seeks for the sentencing to be held in person or remotely.

SO ORDERED.

Dated:      October 20, 2020
            New York, New York

_____
Ronnie Abrams
United States District Judge