UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -                                                    S3 16 Cr. 371 (RA)

MICHELLE MORTON,


Defendant.

# SUPPLEMENTAL SENTENCING MEMORANDUM
## ON BEHALF OF MICHELLE MORTON

CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York 10005
(212) 701-3000
*Attorneys for Michelle Morton*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ..................................................................................... 1

A NON-CUSTODIAL SENTENCE IS WARRANTED UNDER 18 U.S.C. § 3553(a) ............... 2

1.   Ms. Morton Has a High Risk of Severe Complications Should She Contract COVID-19 While Incarcerated ........................................................................................ 3

     a.   Ms. Morton Has Several Chronic Medical Conditions that Classify Her as "High Risk" for Serious Illness if She Contracts COVID-19 ................................. 3

     b.   Given Her Medical Conditions, Ms. Morton Would Be in Grave Danger if Given a Custodial Sentence ................................................................................. 10

     c.   Courts in this District Have Modified Sentences for Medically Vulnerable Defendants Based on COVID-19 ............................................................. 15

2.   A Custodial Sentence Would Cause Severe Harm to Ms. Morton's Family.................... 18

3.   The Remaining Section 3553(a) Factors Weigh Heavily in Favor of a Non-Custodial Sentence ........................................................................................ 20

CONCLUSION ........................................................................................ 22

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*United States* v. *Bayuo*,
No. 15-cr-576 (JGK), 2020 WL 3415226 (S.D.N.Y. June 20, 2020)......................................17

*United States* v. *Cooper*,
No. 13 Cr. 66 (JPO), 2020 WL 4195273 (S.D.N.Y. June 11, 2020) ....................................13

*United States* v. *El-Hanafi*,
No. 10-CR-162 (KMW), 460 F. Supp. 3d 502 (S.D.N.Y. May 19, 2020) ................. 14-15, 17

*United States* v. *Frometa*,
No. 18 CR. 660 (AKH), 2020 WL 6132296 (S.D.N.Y. Oct. 19, 2020) ................................17

*United States* v. *Gross*,
452 F. Supp. 3d 26 (S.D.N.Y. 2020)....................................................................................3

*United States* v. *Park*,
456 F. Supp. 3d 557 (S.D.N.Y. 2020)........................................................... *passim*

*United States* v. *Pena*,
No. 15-cr-551 (AJN), 459 F. Supp. 3d 544 (S.D.N.Y. May 8, 2020) ....................................14

*United States* v. *Rodriguez*,
No. 17-CR-157 (VEC), 2020 WL 3051443 (S.D.N.Y. June 8, 2020)..............................14, 18

*United States* v. *Sarpong*,
No. 04-CR-1106-LTS, 2020 WL 5578420 (S.D.N.Y. Sept. 17, 2020) ..................................15

*United States* v. *Somers*,
No. 17 CR 37-6 (VB), 2020 WL 4505814 (S.D.N.Y. Aug. 5, 2020) ....................................17

*United States* v. *Speed Joyeros, S.A.*,
204 F. Supp. 2d 412 (E.D.N.Y. 2002) ..................................................................................20

*United States* v. *Spencer*,
No. 04 Cr. 1156 (PAE), 2020 WL 3893610 (S.D.N.Y. July 10, 2020)..................................13

*United States* v. *Stewart*,
590 F.3d 93 (2d Cir. 2009)....................................................................................................21

*United States* v. *Williams-Bethea*,
No. 18-CR-78 (AJN), 2020 WL 2848098 (S.D.N.Y. June 2, 2020)........................... 14-15, 17

ii

**Statutes**

18 U.S.C.
    § 3553(a) ................................................................................................ *passim*
    § 3582(c)(1)(A)(i) ........................................................................................16n

**Other Authorities**

Judgment, Dkt. No. 64, *United States* v. *Jackson*, 19-CR-492-RA (S.D.N.Y. July
    1, 2020) ......................................................................................................16

Sentencing Tr., *United States* v. *Jackson*, 19-CR-492-RA (S.D.N.Y. June 30,
    2020) ..........................................................................................................16

## PRELIMINARY STATEMENT

As this Court recently wrote, "[w]e are living in novel and dangerous times." *United States* v. *Park*, 456 F. Supp. 3d 557, 563 (S.D.N.Y. 2020).  Indeed, when the Court sentences Michelle Morton on November 18, 2020, we respectfully submit that Michelle's life – not just her liberty – will be at stake.

As was documented for the Court by Michelle's prior counsel long before the COVID-19 pandemic took root, ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████  As detailed below, these conditions, in addition to Michelle's status as a 60-year-old[1] African-American woman, put her at high risk of developing serious complications from COVID-19.  Well aware of this fact, Michelle has essentially been confined to her home since the pandemic began, leaving only to make necessary trips to the grocery store and the drive-through pharmacy.  When Michelle must leave her home, she encases herself in personal protective equipment, covering her hair and any exposed skin except her eyes.[2]  Were Michelle to be sent to prison during this pandemic, she would be exposed to an environment that this Court has called "a ticking time bomb," *id*. at 560, given the coronavirus's highly infectious nature and the challenges of controlling it in a custodial setting.  That risk is serious enough, but

---

[1] Michelle will turn 60 on November 13, 2020.

[2] Michelle understands that the Court will not grant any further adjournment of her sentencing proceeding.  Because it is unsafe for her to leave her home, although Michelle would very much like to appear in person, unless conditions change significantly between now and then, she requests to appear virtually for sentencing.  At present, counsel plans to appear in person, but respectfully requests the opportunity to revisit that decision on November 16, 2020, in order to assess then-current conditions related to the virus.

Michelle's imprisonment would also endanger her elderly parents, who are both also at high risk for serious complications of COVID-19, and who rely solely on Michelle for their care.  Given this reality, and given that Michelle has been convicted of non-violent offenses and has an extremely low likelihood of recidivating, we respectfully reiterate prior counsel's request that the Court impose a term of home confinement.[3]

## A NON-CUSTODIAL SENTENCE IS WARRANTED UNDER 18 U.S.C. § 3553(a)

The offenses of conviction here are extremely serious.  The government has justifiably devoted an enormous amount of resources to vindicating the interests of the investors who lost money, and the Court has imposed significant sentences on Jason Galanis and the other architects of the fraud that occurred.  Nonetheless, we respectfully submit that, both for the reasons articulated by prior counsel in their submission of November 30, 2018 (the "2018 Memo"),[4] and for the reasons set forth herein, any sentence including a term of incarceration would be greater than necessary to satisfy the factors enumerated in Title 18, United States Code, Section 3553(a).

---

[3] To the extent the Court is also inclined to require that community service be a part of Michelle's sentence, we would request that Michelle be permitted to conduct it from her home, perhaps through a virtual program.

[4] As the Court knows, Michelle's Renewed Motion to Withdraw her Guilty Plea focused on the allegedly deficient conduct of her prior counsel in connection with the circumstances surrounding the entry of her guilty plea in this case.  That motion did not concern the content of the sentencing memorandum that prior counsel submitted on Michelle's behalf on November 16, 2018, Dkt. No. 697 (the "2018 Memo"). We have carefully reviewed the 2018 Memo with our client, including by discussing and verifying the facts and arguments presented therein.  Because we believe the 2018 Memo to be accurate, and because the sentencing arguments presented therein remain valid, we respectfully ask the Court to continue to consider the arguments in the 2018 Memo, and to consider this as a supplemental submission.  We have thoroughly discussed this issue with our client and she has agreed to proceed in this fashion.

1. *Ms. Morton Has a High Risk of Severe Complications Should She Contract COVID-19 While Incarcerated*

Title 18, United States Code, Section 3553(a)(1) requires that courts consider the history and characteristics of defendants at sentencing.  That consideration is distinctly heightened in light of the coronavirus pandemic.  As one court in this District observed, "we are not currently living under normal circumstances."  *United States* v. *Gross*, 452 F. Supp. 3d 26, 30 (S.D.N.Y. 2020).  Rather, as this Court has cautioned, we are living under circumstances in which a term of incarceration can turn into a death sentence if a medically vulnerable inmate catches COVID-19.  *See Park*, 456 F. Supp. 3d at 564 ("The Court fears that leaving [the defendant] any longer at FCI Danbury may convert a three-year prison sentence into a death sentence.  And that the Court cannot allow.").

a. *Ms. Morton Has Several Chronic Medical Conditions that Classify Her as "High Risk" for Serious Illness if She Contracts COVID-19*

As noted in the 2018 Memo, Michelle's chronic medical conditions posed serious risks for her even during a time when no one had ever heard of COVID-19.  *See* 2018 Memo, at 23-26.  As reflected in records submitted under seal in connection with this and prior submissions,









Because Michelle has been uninsured since she left Atlantic Asset Management in 2016, she has not been able to afford regular care or treatment ███████████████ [14] ████████ ███████████████████████████████████ During times of emotional stress, Michelle has often struggled greatly in this regard.  As trial approached in March 2018, prior counsel reported to the Court that ████████████████████████████████████ ████████████████████████████████████████████████

---

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] ████████████████████████████████████████████████

[13] ████████████████████████████████████████████████

[14] Michelle is not old enough to qualify for Medicare, and her household income surpasses that required to qualify for Medicaid.



███████[15] ████████████████████████████████

████████████████████████████████████████████

████████████████████[16] ██████████████████

████████████████████████████[17] ████████████

██████████████████████████████████████████

███████████████████████████████████████[18] ████

███████████████████[19] ██████████████████

████████████[20] ████████████████████████████

██████████████████████████████[21]

Since December 2018, Michelle has continued to battle her medical conditions on a daily

basis. ████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████[22] ██

_____

[15] ████████████████████████████████████

[16] *Id.* at 2.

[17] ████████████████████████████████████████
████████████████████████████████████████

[18] ████████████████████████████████████████
████████████████

[19] ████████████████████████████████

[20] ████████████████████████████████████████
████████████████████████████████████

[21] ████████████████████████████

[22] ████████████████████████████████████████

████████████████████████████████████████████████████████

Due to her lack of medical insurance, the last time Michelle saw a physician was on January 24,

2019. ████████████████████████████████████████████████

████████████████████████████████████████[23] ████████████

████████████████████████████████████████████

█████████   But at least she is currently keep her stress level and exposure to the outside world to

a minimum while in her home.

      The health consequences of a potential custodial sentence are incalculably grave for

Michelle in light of the COVID-19 pandemic. ████████████████████████

█████████████████████████████████████████████

████[24] ███████████████████████████████████

██████████████████████████████[25] ██████████████

████████████████████████████[26] █████████████████

────────────────────

█████████████████████████

[23] ████████████████████████████

[24] ████████████████████████████████████████

[25] ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

[26] ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████





Finally, Michelle will be 60 years old by the time she is sentenced.  According to the

CDC, her age, and the fact that she is African-American, also place her at increased risk for

developing severe illness or complications should she contract COVID-19.[36]

Michelle has been living under lockdown since the pandemic begun, given her serious

concerns about the effect COVID-19 would have on her health.  The above-cited evidence makes

clear that Michelle takes these extreme precautions with good reason.  Were she to contract the

virus, she might well not survive.

b.    *Given Her Medical Conditions, Ms. Morton Would Be in Grave Danger if Given a Custodial Sentence*

The above-described concerns would be magnified exponentially if the Court were to

impose a term of incarceration in Michelle's case.  As this Court has noted, prisons have been

described as "petri dishes for contagious respiratory illnesses."[37]  Indeed, studies have shown that

the likelihood of contracting the virus in prisons is at least 5.5 times higher than within the

general U.S. population.[38]  And this figure might even be higher, given that reported case rates

---

[36] *See Older Adults*, CDC, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last updated Sept. 11, 2020) ("As you get older, your risk for severe illness from COVID-19 increases . . . .  There are also other factors that can increase your risk for severe illness, such as having underlying medical conditions."); *COVID-19 Hospitalization and Death by Age*, CDC, *available at* https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html (the hospitalization rate of adults ages 50-64 years is 4x higher than that of 18-29 year olds, and the death rate of adults ages 50-64 years is 30x higher than that of 18-29 year olds); *COVID-19 Hospitalization and Death by Race/Ethnicity*, CDC, *available at* https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html (the hospitalization rate of Black or African American, Non-Hispanic persons is 4.7x higher than that of White, Non-Hispanic Persons, and the death rate of Black or African American, Non-Hispanic persons is 2.1x higher than that of White, Non-Hispanic Persons).

[37] *See Park*, 456 F. Supp. 3d at 560 (citing *Letters to the Editor: A Prison Doctor's Stark Warning on Coronavirus, Jails and Prisons*, L.A. TIMES (Mar. 20, 2020), https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration).

[38] *See, e.g.*, Brendan Saloner, Ph.D., et al., Research Letter, *COVID-19 Cases and Deaths in Federal and*

"likely understate[] the true prevalence of COVID-19 in prisons" due to uneven testing rates.[39] As of October 27, 2020, at least 161,349 people in prison had tested positive for the virus, and the number of prison infections has recently begun to rise again as the country faces a surging wave of cases.[40]

Scientists have made clear that it is extremely challenging to implement effective social distancing measures in prison environments due to overcrowding and close proximity.[41]  Prisons, by nature, make close contact with others "unavoidable" and are often "overcrowded, poorly ventilated, and unsanitary," making them "epicentres for infectious diseases."[42]  As this Court has explained, "[t]he nature of prisons – crowded, with shared sleeping spaces and common areas, and often with limited access to medical assistance and hygienic products – put those incarcerated inside a facility at heightened risk."  *Park*, 456 F. Supp. 3d at 560.  To make matters worse, the CDC has also expressed concern about prisoners' limited access to sufficient onsite healthcare during the pandemic.[43]

---

*State Prisons*, 324 JAMA 602 (2020), https://jamanetwork.com/journals/jama/fullarticle/2768249.

[39] *Id.*

[40] *See A State-by-State Look at Coronavirus in Prisons*, MARSHALL PROJECT, *available at* https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons (as of October 27, "[t]he number of new infections reached its second-highest level since the start of the pandemic, 400 cases short of the peak in early August.") (last visited November 3, 2020).

[41] *See, e.g.*, Matthew J. Akiyama, M.D., et al., *Flattening the Curve for Incarcerated Populations — Covid-19 in Jails and Prisons*, 382 NEW ENG. J. MED. 2075 (2020), https://www.nejm.org/doi/full/10.1056/NEJMp2005687 ("Highly transmissible novel respiratory pathogens pose a new challenge for incarcerated populations because of the ease with which they spread in congregate settings. . . . 'Social distancing' is a strategy for reducing transmission and "flattening the curve" of cases entering the health care system. Although correctional facilities face risks similar to those of community health care systems, social distancing is extremely challenging in these settings.").

[42] Stuart A. Kinner et al., Comment, *Prisons and Custodial Settings are Part of a Comprehensive Response to COVID-19*, 5 LANCET E188 (2020), https://www.thelancet.com/journals/lanpub/article/PIIS2468-2667(20)30058-X/fulltext.

[43] *Guidance for Correctional & Detention Facilities*, CDC (Oct. 21, 2020), https://www.cdc.gov/

- 11 -

This Court has expressed particular concern about FCI Danbury – the largest federal women's facility to the New York Metropolitan Area, and an institution where Michelle could well be designated if she were sentenced to a term of incarceration – noting a documented and worsening outbreak at that facility in April of this year, and pointing out that U.S. Attorney General William Barr issued a directive specifying the existence of the outbreak at FCI Danbury, among other facilities. *See Park*, 456 F. Supp. 3d at 561–62.  As of October 30, 2020, there were currently four confirmed inmate cases and one staff case at FCI Danbury – more inmate cases than at any other women's facility in the Northeast – and that number is sure to rise as the numbers in the general population continue to spike.[44]

In recognition of the danger to inmates posed by the virus, Attorney General Barr has directed that home confinement be "utilize[d] . . . where appropriate[] to protect the health and safety of" Bureau of Prisons ("BOP") personnel and those in custody.[45]  In his directive, the Attorney General noted that there are "at-risk inmates who are non-violent and pose minimal likelihood of recidivism . . . who might be safer serving their sentences in home confinement rather than in BOP facilities."[46]  He further highlighted several factors to consider when

---

coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html ("Although many large facilities such as prisons and some jails employ onsite healthcare staff and have the capacity to evaluate incarcerated/detained persons for potential illness within a dedicated healthcare space, many smaller facilities do not. Some of these facilities have access to on-call healthcare staff or providers who visit the facility every few days. Others have neither onsite healthcare capacity nor onsite medical isolation/quarantine space and must transfer ill patients to other correctional or detention facilities or local hospitals for evaluation and care.").

[44] *See COVID-19 Coronavirus*, FED. BUREAU OF PRISONS, *available at* https://www.bop.gov/coronavirus/ (interactive map, last visited November 3, 2020).

[45] Att'y Gen. to Dir. of Bureau of Prisons, Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic, at 1 (Mar. 26, 2020), https://www.justice.gov/file/1262731/download.

[46] *Id.* at 1.

assessing which inmates to grant home confinement, including their "age and vulnerability . . . to COVID-19," and the risk of danger they pose to the community.[47]  Although this memorandum is intended for use by the Bureau of Prisons in considering whether to transfer certain inmates out of custody, the factors articulated by the Attorney General are equally relevant to courts as they formulate sentences or consider compassionate release motions.  And Michelle is just the sort of inmate whom the Attorney General has suggested would be safer serving her sentence at home rather than in prison.

As noted, this Court has analogized COVID-19 in a prison setting to a "ticking time bomb." *Park,* 456 F. Supp. 3d at 560.  Similarly recognizing the gravity of the current situation, Judge Engelmayer wrote: "[T]he COVID-19 pandemic is unprecedented in modern times in this nation.  It presents a clear and present danger for reasons that need no elaboration.  And the Government is asking that [defendant] return to—and be quartered—in [*sic*] a BOP facility, the crowded nature of which inherently presents an outsize risk that the COVID-19 contagion, once it gains entry, will spread.  This spread, and ensuing fatalities, have already been documented—and the data reveals dramatically higher rates of COVID spread and fatalities in prisons than in the general population." *United States* v. *Spencer*, No. 04 Cr. 1156 (PAE), 2020 WL 3893610, at *4  (S.D.N.Y. July 10, 2020).

Numerous other judges in this District have agreed that prison settings magnify the already serious risks posed by the virus.  *See, e.g.*, *United States* v. *Cooper*, No. 13 Cr. 66 (JPO), 2020 WL 4195273, at *2 (S.D.N.Y. June 11, 2020) ("Because it is virtually impossible to enforce effective physical distancing in a prison setting with shared cells, shared bathrooms, and shared dining facilities, the risk of spread of the coronavirus is significantly increased in

---

[47] *Id.* at 1-2.

prison."); *United States* v. *Rodriguez*, No. 17-CR-157 (VEC), 2020 WL 3051443, at *2–3

(S.D.N.Y. June 8, 2020) (determining that, although the BOP "is following [Centers for Disease

Control and Prevention] guidance," constraints on the supply of masks for inmates and

insufficient COVID-19 screening and testing procedures "cumulatively result[] in added risk to

inmates being held in federal prisons"); *United States* v. *El-Hanafi*, No. 10-CR-162 (KMW), 460

F. Supp. 3d 502, 508 (S.D.N.Y. May 19, 2020) ("COVID-19 presents increased dangers in

prison settings, where it is difficult to practice consistent social distancing, to maintain strict

hygiene, and to take other preventative cautions.").

Courts in this District have also acknowledged that prison environments are inherently

conducive to transmission of the virus, finding danger for at-risk inmates even where case rates

are low and in spite of the BOP's efforts to mitigate the risks.  In *United States* v. *Williams-

Bethea*, Judge Nathan determined that the defendant would "continue[] to face extraordinary

danger from COVID-19 so long as she remain[ed] in custody," even though the BOP facility the

defendant was placed in had no positive cases at the time.  No. 18-CR-78 (AJN), 2020 WL

2848098, at *5 (S.D.N.Y. June 2, 2020); *see also United States* v. *Pena*, No. 15-cr-551 (AJN),

459 F. Supp. 3d 544, 551 (S.D.N.Y. May 8, 2020) ("[T]he COVID-19 pandemic presents an

extraordinary and unprecedented threat to incarcerated individuals. . . . This is true even though .

. . the [BOP] has taken significant action to reduce the risk COVID-19 poses to prisoners.").

Should the government contend that Michelle is in just as much danger at her home as

she would be in a BOP facility, at least one court in this District has already found that this

argument "strains credulity," adding that "no matter the measures taken by the BOP, carceral

settings inhere with qualities that make transmission of communicable diseases like COVID-19

likely. . . . The Government cannot plausibly compare the risks posed by the virus to [defendant]

while she is incarcerated to those while she is in her home, and the Court rejects this argument." *Williams-Bethea*, 2020 WL 2848098, at *5.

Courts have further recognized that "the problem of COVID-19 infection in jails and prisons likely runs deeper than we know," recognizing that asymptomatic inmates who may not be tested for the virus may transmit it to those who are exceptionally vulnerable. *El-Hanafi*, 460 F. Supp. 3d at 508 ("Tellingly, mass testing, in the few correctional facilities that have undertaken it, revealed vast hidden asymptomatic outbreaks."). In *United States* v. *Sarpong*, No. 04-CR-1106-LTS, 2020 WL 5578420, at *1 (S.D.N.Y. Sept. 17, 2020), Judge Swain recently opined that "[b]ecause the pandemic continues to pose an increased risk for those who are held in custody, there is a public interest in removing high-risk persons from the prison environment to slow the spread of COVID-19 within the prison and permit [the defendant] to protect his own health in an environment where cleaning products are readily available and social distancing is feasible." As Judge Swain explained, in addition to helping high-risk defendants, there are also benefits to BOP communities at large that stem from removing them from the prison population.

In light of these concerns, as set forth below, since the pandemic began, courts in this District have been exercising their discretion to order compassionate release for and impose non-incarceratory sentences upon medically vulnerable inmates like Michelle who have committed non-violent offenses and have a low risk of recidivism.

### c. Courts in this District Have Modified Sentences for Medically Vulnerable Defendants Based on COVID-19

Courts in this District have recognized the potentially fatal consequences that high-risk defendants may face from incarceration during the COVID-19 pandemic by ordering non-incarceratory sentences and compassionate releases. This Court has done so on at least two recent occasions. In *United States* v. *Jackson*, No. 19 Cr. 492 (RA), Your Honor imposed a

sentence of home confinement in a gun possession case in light of the defendant's hypertension, asthma, and obesity, even though the defendant had what the Court considered to be a troubling (if dated) criminal history. *See* Sentencing Tr. at 17:11-18, *United States* v. *Jackson*, 19-CR-492-RA (S.D.N.Y. June 30, 2020) ("I am also, as you all have seen, very concerned about the health risk. People who are incarcerated now are at higher risk of developing a serious, potentially fatal reaction to COVID if contracted. And while it may be that [the defendant] is not at the greatest risk, he, in light of his health conditions –his asthma, hypertension, and obesity –is at a greater risk of harm, and I think it is appropriate for me to consider that as well, and I have done so."); Judgment, Dkt. No. 64, *United States* v. *Jackson*, 19-CR-492-RA (S.D.N.Y. July 1, 2020).

Additionally, in an opinion referenced numerous times in this memorandum, in *United States* v. *Park*, this Court granted the defendant's compassionate release motion[48] and placed her in home confinement in light of her documented history of respiratory and immunocompromising diseases. 456 F. Supp. 3d 557, 563–64 (S.D.N.Y. 2020). In that case, the defendant had been convicted of defrauding, "through charm and manipulation . . . more than 40 individuals of $23 million" for over six years. *Id.* at 562. There are numerous parallels between the defendant in *Park* and Michelle. Both defendants were convicted of non-violent, fraud-related offenses, and neither defendant is likely to recidivate. Both defendants have documented and serious medical conditions. The Court has commented that both defendants engaged in manipulation. *Id.*; Dkt. No. 933, Opinion & Order, at 2, 18, 24, 33, 41. We thus urge the Court

---

[48] The standard for compassionate release is higher than that required in sentencings, which only require the Court to consider the 3553(a) factors. This Court need not find "extraordinary and compelling" circumstances justifying a non-incarceratory sentence for Michelle. 18 U.S.C. § 3582(c)(1)(A)(i).It simply must impose a sentence that is sufficient, but not greater than necessary to achieve the objectives of sentencing. 18 U.S.C. § 3553(a).

to follow the same reasoning articulated in its powerful opinion in *Park*, where it noted that although the defendant's "conduct was egregious," allowing the defendant to remain in custody would "convert a three-year prison sentence into a death sentence," thus resulting in punishment "immeasurably greater than necessary." *Id.* at 564.  The Court found that it could "not allow" that result for Ms. Park.  *Id.* at 563.  Similarly, it should not allow Michelle to suffer that fate.

Numerous other judges in this District have reached similar conclusions.  For example, in *United States* v. *Bayuo*, No. 15-cr-576 (JGK), 2020 WL 3415226, at *1–*3 (S.D.N.Y. June 20, 2020), Judge Koeltl granted compassionate release to a 49-year-old defendant with diabetes and high blood pressure even though the defendant had only served one-quarter of her sentence, on the grounds that the defendant's ailments "present[ed] a risk factor identified by the CDC as heightening the risk of severe injury or death [if she were] to contract COVID-19"); *see also El-Hanafi*, 460 F. Supp. 3d at 509 (granting compassionate release to defendant with hypertension, stage 3 kidney failure, and severe anti-phospholipid syndrome on grounds that "infection from COVID-19 could well be fatal"); *United States* v. *Frometa*, No. 18 CR. 660 (AKH), 2020 WL 6132296, at *1 (S.D.N.Y. Oct. 19, 2020) (granting compassionate release to 42-year-old defendant suffering from hypertension); *Williams-Bethea*, 2020 WL 2848098, at *4 (granting compassionate release to morbidly obese defendant on the grounds that her "several underlying health conditions" increased her vulnerability to COVID-19 infection and risk of injury or death, and that this increase in risk weighed "heavily in favor" of her release); *United States* v. *Somers*, No. 17 CR 37-6 (VB), 2020 WL 4505814, at *1 (S.D.N.Y. Aug. 5, 2020) (finding "extraordinary and compelling reasons" that warranted a sentence reduction in light of COVID-19 due to defendant's high blood pressure, unspecified chronic kidney condition, obesity, and being pre-diabetic); *United States* v. *Rodriguez*, No. 17-CR-157 (VEC), 2020 WL 3051443, at *1

(S.D.N.Y. June 8, 2020) (granting compassionate release to defendant who suffers from an autoimmune disorder and asthma, elevating risk of severe illness if he were to contract COVID-19).

　　As these judges concluded in the above-cited cases, any amount of time spent in prison has the potential to convert Michelle's sentence into a death sentence.  And although the offenses of conviction are undoubtedly serious, neither the government nor the Probation Office has expressed the view that a term greater than the Stipulated Guidelines Sentence would be fair or appropriate.  The difference between a Guidelines sentence and a sentence of home confinement here is indeed significant, but there is no middle ground under these circumstances.  As soon as Michelle might be required to report to a BOP facility, she would be put at serious risk of contracting COVID-19.  Given Michelle's health conditions, that risk is far too grave.  If the Court agrees with this assessment, then a sentence of home confinement is the only fair and appropriate sentence in this case.  Any sentence of incarceration would be greater than necessary to achieve the goals of sentencing articulated in Title 18, United States Code, Section 3553(a).

　　　　*2.  A Custodial Sentence Would Cause Severe Harm to Ms. Morton's Family*

　　The medical concerns articulated above overwhelmingly counsel in favor of a non-custodial sentence, but the Court should also consider the devastating impact that Michelle's incarceration would have on her elderly parents, who are also at high risk for COVID-19 complications.  As Michelle's parents' letters of support make clear, a prison sentence would have dire effects on their lives.[49]

---

[49] *See* Letter from Beatrice Morton, dated October 30, 2020 (attached hereto as Exhibit 1); Letter from Ronald Morton, dated October 30, 2020 (attached hereto as Exhibit 2).

Michelle's 82-year-old mother Betty puts it most succinctly: "If Michelle is not here, we do not have another source of care."[50]  Betty describes the list of responsibilities Michelle assumes around the house, including maintaining the home, doing the grocery shopping, cooking, assisting her and her husband with personal grooming, and checking on her and her husband during the night to make sure they are sleeping well.  She notes that Michelle never complains about these responsibilities, even though she has health issues of her own.  Betty fears what would become of her and her husband if Michelle were to be incarcerated, as they both are not only elderly, but also at high-risk of severe complications from COVID-19.  Perhaps most poignantly, Betty fears that were Michelle to go to prison, she would never see her daughter again, because it would not be safe for her to visit.[51]

Michelle's 86-year-old father Ronald writes movingly about ███████████████ ████████████████████████████████████████████████████ ███████████████ and how their roles are reversed now that Michelle is the one taking care of him.[52]  Ronald views Michelle like his "nurse and mother," noting that "life would be much harder if Michelle weren't around."[53]  He details his numerous medical conditions, which put him at high risk of severe complications from COVID-19, and points out that Michelle puts

---

[50] *See* Ex. 1 (Letter from B. Morton) at 1.

[51] *See id.* at 1-2.

[52] Ex. 2 (Letter from R. Morton) at 1.

[53] *Id.* at 1-2.

herself in "harm's way by going grocery shopping and running errands" for him and his wife.[54]
Ronald also fears that Michelle could "die alone[] and in distress" of COVID-19 in prison.[55]

 As these letters make clear, Betty and Ronald would not be able to function without Michelle.  Her continued presence is integral to their ability to manage their home, medical challenges, and physical needs, and caring for them has become her primary purpose in life.  If the Court imposes an incarceratory sentence, it will not only endanger Michelle's life, but will also endanger Ronald's and Betty's lives, as there is no one else to care for them.

>   3.  *The Remaining Section 3553(a) Factors Weigh Heavily in Favor of a Non-Custodial Sentence*

Michelle need not be incarcerated to vindicate any of the sentencing factors articulated in Title 18, United States Code, Sections 3553(a)(2)(B) or (C).  As an initial matter, Michelle is already *de facto* incarcerated in her home, and will be until whenever the pandemic is definitively over.  Even before the pandemic began, Michelle rarely left her home due to her ill health, her fear of catching a contagious disease, and because she lacks funds to engage in any activities outside the home.  Michelle has no job, and as a result of her conviction and industry bar, no prospect of obtaining future work in the financial world – the only area in which she has ever worked.  The probability of her committing another financial crime is slim to none.  Her offense was non-violent, and she has no other criminal history.  Her conviction alone thus definitively serves purposes of deterring Michelle and the public from engaging in similar conduct, and protecting the public from any further crimes.  *See United States* v. *Speed Joyeros, S.A.*, 204 F. Supp. 2d 412, 440-41 (E.D.N.Y. 2002) ("The purposes of the guidelines, protection

---

[54] *Id.* at 2.

[55] *Id.*

of the public and deterrence of crime, are independently met through the destruction of the

defendant's business."); *United States* v. *Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (holding that

because it was "doubtful that the defendant could pursue his career . . . the need for further

deterrence and protection of the public is lessened") (internal quotation marks and citation

omitted).

      The Court also need not be concerned about unwarranted sentencing disparities under

Title 18, United States Code, Section 3553(a)(6).  Thus far, her co-defendants' sentences range

between 30 and 173 months' imprisonment, a significant range that accounts for their varying

degrees of culpability and their differing histories and characteristics.  We respectfully submit

that Michelle's status as an "outsider" from the Galanis group,[56] as well as her cooperation with

the government at the outset of its investigation, set her apart from her co-defendants.  And of

course, none of Michelle's co-defendants were sentenced amidst the COVID-19 pandemic – an

event that has definitively changed the way that courts must consider the prospect of

incarceration in criminal cases.  Given these distinctions, the Court can and should consider

Michelle's case separately from those of her co-defendants, placing her medical conditions as

paramount among the factors to be weighed.

      Finally, although the government has argued, and may argue again, that the seriousness

of Michelle's offense requires a term of incarceration under Title 18, United States Code, Section

3553(a)(2)(A), we respectfully disagree.  Michelle is a sick woman who spends her days at home

---

[56] *See* Trial Testimony of H. Dunkerley, dated June 4-6, 2018 at 1056:11-13 ("The first part [of the plan] involved Atlantic Asset Management and effectively placing the blame on Michelle Morton"); *id.* at 1508:2-5 ([the plan was to] "throw Michelle Morton under the bus and that was going to be the narrative").  It should also be noted that Michelle did not receive notice of either of these statements (the former of which was elicited on direct examination) in advance of her guilty plea, which may have constituted a violation of the Court's October 30, 2020 Order.  *See* Dkt. No. 936.

- 21 -

caring for her elderly parents.  She does not present a danger to the community.  She has suffered – and will continue to suffer – greatly from her conviction in this case.  The Court need not imperil her life to punish her further.

## **CONCLUSION**

For the foregoing reasons, we respectfully request that the Court sentence Michelle to a term of home confinement.

Dated:  November 3, 2020
        New York, New York

By: /s/ Nola B. Heller

CAHILL GORDON & REINDEL LLP

Nola B. Heller
Samantha Lawson
Julia Koch
Cindy Ham
Danielle Simard
32 Old Slip
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
nheller@cahill.com
slawson@cahill.com
jkoch@cahill.com
cham@cahill.com
dsimard@cahill.com

*Attorneys for Michelle Morton*