

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 9, 2020

**By Email and ECF**
The Honorable Ronnie Abrams
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

      Re:    <u>United States v. Michelle Morton</u>, 16 Cr. 371 (RA)

Dear Judge Abrams:

      The Government respectfully submits this supplemental sentencing submission in advance of defendant Michelle Morton's November 18, 2020 sentencing and in opposition to her supplemental submission of November 3, 2020 ("Def. Supp. Sub."). As set forth in greater detail below, neither the defendant's medical condition nor the COVID-19 pandemic justifies the defendant's extraordinary request to escape serving even a single day of imprisonment. To the contrary, as set forth in the Government's November 23, 2018 sentencing submission, given the seriousness of the offense, Morton's role in it, her efforts to blame others for her own criminal conduct, and her wholesale failure to accept any responsibility for her actions, a Guidelines sentence of 120 months is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Background

      On May 16, 2018, just six days prior to trial, Morton pleaded guilty pursuant to a plea agreement with the Government to one count of conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371, and one count of investment adviser fraud, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17, and Title 18, United States Code, Section 2. In that agreement, Morton stipulated that the applicable Guidelines sentence was 120 months' imprisonment.

      On July 20, 2018, Morton moved to withdraw her guilty plea, claiming it had not been knowingly made. On August 17, 2018, this Court denied that motion. Sentencing was scheduled for November 30, 2018.

      On November 16, 2018, Morton filed a sentencing submission seeking a non-incarceratory sentence on the basis of her purported role in the offense, purported cooperation, health, and family circumstances. The Government filed its sentencing submission on November 23, 2018, seeking a

Guidelines sentence on the basis of the seriousness of the crime, Morton's essential role, and her lack of remorse and failure to accept responsibility.

On the morning of sentencing, defense counsel informed the Court that sentencing could not proceed ▮. Sentencing was adjourned to December 21, 2018. On the eve of this second sentencing date, however, Morton informed the Court that she wished to be appointed new counsel. The Court granted that request and on May 17, 2019, Morton filed a second motion to withdraw her guilty plea, this time claiming that her previous attorneys had pressured her to plead guilty. In March 2020, the Court held a four-day hearing concerning Morton's claim. Both of Morton's former attorneys testified. Following additional briefing, the Court denied Morton's motion, concluding that defense counsel had acted as vigorous and zealous advocates who had never pressured Morton to plead guilty, and describing Morton's claims to the contrary to be those of a "skilled manipulator." (Dkt. # 933 at 2). The Court further noted that "Morton has repeatedly attempted to manipulate others in order to avoid the consequences of her conduct," a manipulation that "must end now." (*Id.* at 41).

## Discussion

Morton argues that a non-incarceratory sentence is necessary in this case because her medical conditions render her at increased risk from COVID-19 and because an incarceratory sentence would harm her elderly parents who have no one but her to care for them.[1] Morton's medical records establish that ▮, which does put her at higher risk should she contract COVID-19.[2] But she is wrong that this increased risk requires or justifies a non-incarceratory sentence.

Morton acknowledges that "[t]he difference between a Guidelines sentence and a sentence of home confinement here is indeed significant," but argues that "there is no middle ground under these circumstances." (Def. Supp. Sub at 18). Morton is simply wrong. Unlike defendants who are already incarcerated – and for whom a Court must make the binary choice between granting and denying compassionate release – the Court here has a third option. The Court can, and should, impose the incarceratory term it would have imposed in the absence of

---

[1] The Government will not repeat the arguments in favor of a Guidelines sentence contained in its November 23, 2018 submission, which apply with as much – if not more – force today as they did two years ago. Instead, this submission addresses only those arguments raised in the defendant's supplemental sentencing submission filed on November 3, 2020.

[2] Other than a short letter from a doctor who saw Morton ▮ in November 2018 and for a single follow up visit in January 2019, the medical records Morton has submitted are quite dated. ▮

COVID-19. But rather than order a surrender date in the next few months, the Court may delay Morton's surrender until the Spring or until such time as the COVID-19 pandemic is better controlled. That reasonable middle ground permits the Court both to accommodate Morton's increased health risks and to impose a sentence that adequately serves the purpose of sentencing.

The defendant relies heavily on this Court's decision in *Park* in support of her argument that she is too ill to be jailed. *United States v. Park*, 456 F. Supp. 3d 557 (S.D.N.Y. 2020). In *Park*, however, this Court explained that its "preferred course of action would have been to grant [the defendant] temporary release, removing her from FCI Danbury during the pandemic while requiring her to eventually serve the remainder of her sentence once the danger from COVID-19 had subsided." *Id.* at 562. It was only because the Court was "without [the] authority to grant the relief it believe[d] most proper" that it ultimately granted Park's motion for compassionate release after she had served only half her sentence.[3] *Id.* at 563. In contrast, in the present case, the Court has the ability to keep Morton out of prison during the pandemic while requiring her to serve her full sentence once the danger from COVID-19 has subsided. That is what the Court should do.

Given the availability of delayed surrender, Morton's arguments about the conditions of confinement or her increased vulnerability are moot. It nonetheless bears briefly noting that those arguments too are overblown. First, Morton's attacks on the conditions at FCI Danbury are a straw man, since she has not yet been designated to a facility and she may well not be assigned to FCI Danbury. Moreover, Morton's attacks on FCI Danbury date from an outbreak at the facility at the outset of the COVID-19 pandemic. As this Court is well aware, BOP has taken significant steps since that date to continue to ensure inmate safety. And indeed, those steps appear to have been quite successful. As of today, there are *zero* inmates and *zero* staff at FCI Danbury who have tested positive for COVID-19.

Nor would Morton's medical condition justify the extraordinary windfall she seeks even if she were to begin serving her sentence immediately. As numerous courts in this district have found in the compassionate release context, the mere fact that a defendant is a non-violent offender, is elderly, or suffers from COVID-19 comorbidities is often insufficient to justify release, particularly where a defendant has served only a small portion of her sentence. *See, e.g., United States v. Schlisser*, 17 Cr. 86 (VEC) (S.D.N.Y. July 21, 2020) (Dkt. 73) (denying compassionate release for sixty year-old fraud defendant with prior "aortic dissection" and hypertension, where release would amount to a two-thirds reduction of defendant's sentence); *United States v. Nathaniel Slater*, 04 Cr. 48-36 (JSR) (S.D.N.Y. June 30, 2020) (Dkt. 1251) (defendant who had served small percentage of 335-month sentence denied compassionate release despite argument that his hypertension made him vulnerable to COVID-19); *United States v. Shereshevsky*, 08 Cr. 1092 (DC) (June 16, 2020) (Dkt. 154) (denying compassionate release for defendant who would have served fewer than 12 years of 262-month sentence);

---

[3] *Park* is distinguishable in many other ways. While Park had served half her sentence, Morton has not yet served a day in prison. And while Park had "taken steps to rehabilitate herself while incarcerated," Morton has continued to disclaim responsibility for her actions, first blaming her co-defendants and later her own attorneys.

*United States v. Denault*, 11 Cr. 121 (GBD) (S.D.N.Y. June 1, 2020) (Dkt. 563) (denying compassionate release where defendant had served only six years of a 20-year sentence); *United States v. Farchione*, 17 Cr. 628 (JPO), 2020 WL 2319291, at *2 (S.D.N.Y. May 11, 2020) (denying compassionate release application of 67-year-old with conditions including hypertension and heart disease, and who was a first time, non-violent offender, including because "[m]ost importantly, [the defendant] has only served one year of his seven-year sentence, which itself was well below the Guidelines"); *United States v. Martin*, No. 18 Cr. 834 (PAE) (S.D.N.Y. Apr. 10, 2020) (Dkt. 465 at 8) (denying compassionate release where defendant had served 16 months of 66-month sentence, and court assumed defendant to be at heightened risk because of punctured lung); *United States v. Butler*, No. 18 Cr. 834 (PAE) (S.D.N.Y. Apr. 7, 2020) (Dkt. 461 at 5) (denying compassionate release where defendant had served 15 of 60 months; defendant had asthma and cardiac condition). And that is true even for defendants who have served significant portions of their sentences. It is all the more true for Morton, who has not yet served a day of imprisonment.

Morton also argues that a non-incarceratory sentence is warranted because she is the caretaker for her elderly parents, who are themselves at high risk from COVID-19, and in her absence "there is no one else to care for them." (Def. Supp. Sub. at 19). The Government is, of course, sympathetic to Morton's parents' desire to keep her in their home. But the collateral consequences of a defendant's criminal conduct frequently fall on her innocent family members. That itself cannot be a basis for the enormous sentencing benefit the defendant seeks. And here too, a delayed surrender date may well obviate some of Morton's parents' concerns. More importantly, perhaps, Morton is wrong that there is no one else to care for her parents. As Morton herself acknowledges, her brother and sister-in-law are living with Morton and her parents. (PSR ¶ 107; 142). While they may have their own challenging obligations, it is hardly the case that if Morton were incarcerated her parents would be wholly uncared for. Nor does the fact that Morton's other sibling travels extensively for work render him completely unavailable to assist her parents.

Finally, the defendant argues that the 3553(a) factors weigh in favor of a non-custodial sentence, pointing to the fact that (i) Morton is largely homebound as the result of her unemployment, health concerns and the COVID-19 pandemic; (ii) she is at a low risk of recidivism; and (iii) a non-incarceratory sentence would not represent an unwarranted sentencing disparity in light of her "status as an 'outsider' from the Galanis group,[4] as well as her

---

[4] As evidence for her purported "'outsider' status from the Galanis group" Morton cites to trial testimony in which Dunkerley explained that "The first part [of the plan] involved Atlantic Asset Management and effectively placing the blame on Michelle Morton" and that"[the plan was to] throw Michelle Morton under the bus and that was going to be the narrative." (Def. Supp. Mot. at 21, n.1). Morton then claims that "it should be noted that Michelle did not receive notice of either of these statements (the former of which was elicited on direct examination) in advance of her guilty plea, which may have constituted a violation of the Court's October 30, 2020 Order." Morton's insinuation of a possible *Brady* violation is both unfair and unwarranted. Most importantly, it is nonsensical to suggest that trial testimony elicited on June 4 and 6, 2018 should have been produced prior to Morton's plea three weeks *prior* on May 16, 2018. Nor could any purported failure have

cooperation with the government at the outset of its investigation." (Def. Supp. Sub. at 21). But the limitations on Morton's activities resulting from COVID-19 are not punishment for her crime; they are the same limitations experienced by the entire population. Those limits do not constitute punishment and thus do not serve 3553(a)'s mandate for just punishment. While it is true that Morton's conviction renders it unlikely she will ever again be in a position to steal tens of millions of dollars of her investment advisory clients' money, her complete failure to accept responsibility – even to this day, as evidenced by her continuing objection to any statement that Morton "intended to commit the charged crimes" in the Presentence Investigation Report and elsewhere, *see* Dkt. 937 at 3-4 – raises serious concerns that she has not been deterred by her conviction. And a non-incarceratory sentence would indeed represent a serious sentencing disparity with respect to her co-defendants. First, as set forth in further detail in the Government's initial sentencing submission, Morton's "cooperation" does not merit any reduction in sentence. Dkt. 701 at 16-18. Nor was Morton an "outsider" from the "Galanis group." Morton was in direct contact with Jason Galanis, Hugh Dunkerley and Gary Hirst. She played a significant and essential role in the offense. And unlike many of her co-defendants, she was an investment advisor with elevated fiduciary duties to her clients. In light of the sentences received by her co-defendants to date – the *lowest* of which was 30 months' – a non-incarceratory sentence would absolutely constitute an unwarranted sentencing disparity.

[This Section Intentionally Left Blank]

---

violated the Court's October 30, 2020 Order, entered nearly 18 months later. Moreover, as the context of Dunkerley's testimony makes clear, nothing about his testimony was exculpatory as to Morton's guilt. Dunkerley's testimony made clear that Morton had in fact fraudulently placed her clients in the bonds. In the testimony Morton cites, Dunkerley and Galanis merely discussed offering up Morton as the "fall guy" after the scheme unraveled. This after-the-fact cover up discussion was therefore not exculpatory as to Morton. Morton's effort to "note" this implied violation without seeking any relief – relief she indeed cannot seek, having waived that right in her plea agreement – is an unwarranted effort to smear the Government.

Morton played a key role in a complex and massive fraud.  She abandoned her fiduciary duties as an investment adviser and not once, but twice, used tens of millions of dollars of her clients' money to purchase worthless bonds.  In the now more than four years since her arrest, she has placed the blame on the Government, on her co-defendants, and even on her own attorneys.  But she has never once acknowledged that the blame is actually her own.  A Guidelines sentence is thus necessary to serve the legitimate purposes of sentencing in this case.

> Respectfully submitted,
>
> AUDREY STRAUSS
> Acting United States Attorney
>
> By:  /s/ Rebecca Mermelstein
> Rebecca Mermelstein
> Negar Tekeei
> Elizabeth Hanft
> Assistant United States Attorneys
> (212) 637-2360/2482/2334

cc:   Nola Heller, Esq. (via ECF)